COMMONWEALTH vs. MICHAEL B. CORRADINO
(and a companion case [1]).

Suffolk.  May 5, 1975. — July 30, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, & KAPLAN, JJ.

*Search and Seizure.  Probable Cause.  Practice, Criminal,* Suppression of evidence, Trial of defendants together, Discovery, New trial. *Jury and Jurors.*

In an application on a Monday evening for a search warrant for described premises, recitals that on the preceding Sunday afternoon the police had received an anonymous telephone call that a shooting had taken place on the premises, that on Monday morning the body of a shooting victim who had participated frequently in illegal card games on its second floor was found in a street, that probably he had been playing cards on Sunday, that there was ill feeling between him and the "operator" of the games, and that on Monday afternoon a mop and pail were carried out of the second floor justified a conclusion that probable cause existed for issuance of the warrant.  [413-417]

At a joint trial of indictments against one defendant for murder and against another defendant for being an accessory after the fact, there was no error in the denial of the defendants' respective motions to sever; the case against the murder defendant was not added to by a statement of the accessory defendant to a police officer that police had "found the blood from a fight on the floor"; a command by the murder defendant to an eyewitness that he "didn't see nothing" had no substantial prejudicial effect against the accessory defendant, and an indication of guilty knowledge by the accessory defendant in a telephone conversation was without significant impact against the murder defendant.  [419-421]

There was no prejudice to defendants "in custody" at a criminal trial in the judge's refusal to question the jurors upon being brought into the court room one morning as to whether they had discussed the case since one juror had heard an exculpatory statement by one defendant as the jury passed him on their way out the previous evening.  [421]

[1] Commonwealth vs. Alfred Abate, Jr.

Following convictions resulting from a murder, there was no error in
the denial of motions for a new trial based on the grounds that an
eyewitness whom the defendants knew and understood would
testify at the trial was incorrectly named in the list of witnesses
[421-423]; and that an out-of-State conviction of the eyewitness of
bigamy about twenty years previously had not been included in
the prior criminal records of witnesses [423].

Following conviction of defendants resulting from a murder by
shooting, there was no abuse of discretion in denial of a motion
for a new trial grounded on expected testimony of two new po-
tential witnesses, supported by affidavits from both, that no shoot-
ing had occurred; the affidavits were contradicted by testimony of
several trial witnesses, and part of one new witness's testimony
could be rejected as incredible. [423-424]

INDICTMENTS found and returned in the Superior Court
on October 19, 1973.

A pre-trial motion to suppress evidence was heard by
*Lappin,* J., and the cases were tried before him.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*Harvey Brower* for the defendants.

*Thomas E. Dwyer, Jr.,* Special Assistant District At-
torney, for the Commonwealth.

KAPLAN, J. On May 7, 1973, the body of Michael J.
Barry was found at Carter Street in Chelsea. He had
been shot twice in the head. Five months later a Suffolk
County grand jury indicted Michael B. Corradino and
Alfred Abate, Jr., the former for the murder in the first
degree of Barry, the latter as being accessory after the
fact to the murder.

Trial of the defendants jointly, subject to G. L. c. 278,
§§ 33A-33G, resulted in Corradino's being found guilty of
murder in the second degree and Abate guilty as charged
of being accessory after the fact.[2]

On this appeal, each defendant urges four grounds for
reversal: denial of a pre-trial motion to suppress evidence

[2] Corradino was given the mandatory sentence of life imprisonment;
Abate was sentenced to a term of five to seven years.

siezed during a search, under warrant, of the premises where the murder was alleged to have occurred; denial of a motion to sever the trials under the rule of *Bruton* v. *United States*, 391 U. S. 123 (1968); refusal to question the jurors as to whether they had discussed the case among themselves following an incident in the court house; and denial of a motion for a new trial based on the Commonwealth's failure to produce the complete prior criminal record of its key witness, one Carmino Robert Palermo, and also on the claimed availability of two new witnesses who could testify to the defendants' innocence. Exceptions on these points were taken and errors assigned.[3]

1. The defendants do not challenge the sufficiency of the evidence to support the verdicts if the evidence seized under warrant was admissible, and so we turn at once to the judge's denial of the motion to suppress. In question here is only the sufficiency of the sworn application for the warrant, since the affidavits of the defendants offered at the pre-trial hearing neither contradicted the application nor suggested that the search was beyond the scope of the warrant, and the examination by the defense of Lieutenant Keating of the Chelsea police, who applied for the warrant and was the only witness called at the hearing, failed absolutely to shake any assertion in the application.

The Keating application is quite detailed and recounts the following. On Sunday, May 6, at 3 P.M., the police received an anonymous telephone call that a shooting had taken place "in" a bar known as Dorothy's Cafe. (This occupies the ground floor of a two-story building at 94-98 Park Street, Chelsea; the upstairs is reached by a separate street entrance.) Cruiser officers responded to the call and entered the bar but reported no evidence of a shooting.

---

[3] Other assignments of error, not argued, are deemed waived. See *Commonwealth* v. *Nassar*, 351 Mass. 37, 49 (1966). See also n. 8 below.

Barry's body was found the following day at 6:25 A.M. Barry had been recently released after serving a sentence for armed robbery. He had a long criminal record. Lieutenant Keating knew of a link between Barry and Corradino: on April 24, Keating had arrested Corradino for unlawful possession of a revolver and found among Corradino's papers a parking ticket for a vehicle registered to Barry. Keating also knew Corradino as a daily visitor to Dorothy's Café. The police had long suspected that unlawful card games took place regularly on the second floor of the building housing that café.[4]

On Monday the police acquired further information. From Shirley Mann, Barry's girl friend, they learned that Barry was a frequent participant, with Corradino, Abate, Lenny Senibaldi, and others, in the illegal card games at the upstairs room above Dorothy's. Miss Mann had accompanied Barry to these games on several occasions and learned that Corradino was the "operator" of the games. She said she knew that Barry had been involved in several "bad" arguments with Corradino and Abate concerning their cheating at cards: the most recent incident was on May 4, which Barry related to her; another, about a month before, between Barry and Corradino, she had herself witnessed. Miss Mann also told the police that Barry had told her he would be playing cards after 2 A.M. on May 6.[5]

The Park Street premises were rented by (among others) Francine Corradino, whose address was the same as that of Michael Corradino.

---

[4] In *United States* v. *Harris*, 403 U. S. 573, 583 (1971) (plurality opinion), police knowledge of reputation (as a bootlegger) was permitted to be used to substantiate other information in piecing out probable cause. We followed the same rule in *Commonwealth* v. *Anderson*, 362 Mass. 74, 77 (1972), and *Commonwealth* v. *Hall*, 366 Mass. 790, 798 (1975).

[5] It is perhaps worth noting that the statements here made to the police need not be approached with the hesitation appropriate to those of police informants, with selfish incentives to give false in-

Lieutenant Keating and other police on Monday afternoon observed Corradino in a car driven by Lenny Senibaldi parked at the intersection of Carter Street and Everett Avenue. The car proceeded to the rear of Dorothy's Café and parked there. When Senibaldi and Corradino observed Keating's cruiser coming up behind them, they immediately drove off.

Abate and one Sheila Ciaramello were seen by the police on Monday afternoon coming out of the street doorway leading upstairs carrying a mop and yellow pail.

In his application Monday evening, Lieutenant Keating sought a warrant for the premises 94-98 Park Street, upstairs and downstairs, to search there for a small-caliber firearm and ammunition, bloodstained clothing or other paraphernalia, a bloodstained mop, and a yellow pail. A warrant issued and search was made forthwith with the telling results to be mentioned at point 2 below.

Because the evidence was seized during a search authorized by warrant, the defendants had the burden of proof on the motion to suppress. *Commonwealth* v. *Fancy*, 349 Mass. 196, 202 (1965); *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 56 (1974). Part of that burden was to show "standing" to make the challenge by demonstrating a possessory interest in the premises searched or the property seized, see *Brown* v. *United States*, 411 U. S. 223, 229 (1973), a reasonable expectation of freedom from governmental intrusion, see *Katz* v. *United States*, 389 U. S. 347, 351 (1967); *Mancusi* v. *DeForte*, 392 U. S. 364, 368-369 (1968), or "presence" at the scene at the time of search. See *Jones* v. *United States*, 362 U. S. 257, 267 (1960).[6] The judge shortcut

formation, who regularly figure in the decided cases. Compare *Commonwealth* v. *Lillis*, 349 Mass. 422 (1965).

[6] The *Jones* case states the rule that one lawfully present when a search is conducted has standing to challenge the search. But Jones also had a possessory interest in the premises. Moreover, the evidence seized was used to convict him of possession of narcotics, so that his presence on the scene when the search was conducted was a main

his consideration of the motions by finding that neither defendant had established standing; he thought it unnecessary to pass on the existence of probable cause for issuance of the warrant, the issue on which the hearing had centered. As to Abate, the judge's conclusion appears correct, for nothing was adduced on that point in the defendants' affidavits, the application for the warrant, or the testimony at the hearing. As to Corradino, there is more question. The application refers to Corradino as the "operator" of the card games, there is the statement about the rental of the premises, and Corradino's affidavit says that he was at Dorothy's Cafe' when the search was conducted.

However, we need not pursue the matter of standing to the end, for we believe that the denial of both motions is supported on the plainer ground that the defendants failed to carry their burden of showing that probable cause did not exist. There is no question of witness credibility as to which the trial judge's view would be significant, and we may appraise the documents ourselves. It is not a question of the weight of any one item in the application, but the weight of the congeries of items, and we are to recall that the probable cause requirement "by its very terms recognizes the vast difference between proof of guilt beyond a reasonable doubt on the one hand and proof of probable cause to believe a fact or facts on the other hand." *Commonwealth* v. *Stewart,* 358 Mass. 747, 749 (1971). We may add that, if the police are to be encouraged to use the warrant procedure, it seems good policy to allow a certain leeway or leniency in the after-the-fact review of the sufficiency of applications for warrants. See *United States* v. *Ventresca,* 380 U. S. 102 (1965). Here the ill feeling between Corradino and Barry, the likelihood that Barry

element in the case against him. It is unnecessary to decide here whether "presence" would be found in the absence of the additional factors.

was playing cards in the room above Dorothy's with
Corradino the day before his body was found, the tip
about a shooting at the premises, all appearing from the
application, provided the necessary "objective or con-
crete, substantial basis," see *Commonwealth* v. *Pellier,*
362 Mass. 621, 624-625 (1972), for the belief that the
murder of Barry was committed during an illegal card
game at 94-98 Park Street on May 6, and that some evi-
dence of the crime might be found at that place. More-
over, the observation of Abate and Miss Ciaramello with
mop and pail gave cause to believe that there was a
danger of the removal or elimination of that evidence.

2. For purposes of the later points in this opinion we
give some idea of the evidence presented at the lengthy
trial that could have been credited by the jury.

In the upstairs area above Dorothy's Café there was a
second bar room, part of which was partitioned off as a
card room.  The upstairs was operated on weekend
evenings as an "after hours place" with liquor served and
card games running from 2 A.M. until 6 or 7 A.M. or
later.  The defendants Corradino and Abate were both
dealers in the card games and Abate in addition tended
bar.

Shirley Mann, describing the incident she had wit-
nessed a month before the murder, said Barry angrily
accused Corradino of cheating, and threw chips at him
when the accusation was denied; a fight was avoided
only when others at the table separated the two.

It is left unclear when Michael Barry arrived upstairs
on the morning of May 6, but he was present by 4 or
5 A.M.  Earlier he had been at other bars where he had
had several drinks.

Carmino Robert Palermo testified as an eyewitness to
the shooting of Barry, alleged in the bill of particulars to
have occurred in the card room "at or around 6-7 A.M."[7]

---

[7] A witness who had seen Barry Saturday evening identified the
shirt on Barry's body as the one he was wearing when she saw him.

Carmino was not a patron at the after hours club but a sixty-seven year old man, an ex-boxer, who had come to clean up the bar and card room area about 6:30 A.M. as he frequently did in order to earn a few dollars. He testified to being busy cleaning in the bar area when he heard a commotion at the card tables; he went over to watch. Barry and Corradino were standing at a table. Barry said to Corradino, "You son of a bitch, you owe me money," or words to that effect. Corradino answered, "Sit down," or "Go home." Barry said, "No, I want that money, or I'll break your head." Barry appeared to Palermo to be quite drunk. Barry and Corradino were perhaps a foot apart. Another man, known to Palermo as Sonny, a cook at Dorothy's, grabbed Barry and pulled him back when he tried to lunge at Corradino. Corradino, at this moment four feet from Barry, drew something out of his pocket and fired. Palermo saw blood spurt from Barry's head. Barry slumped to the floor. Palermo and Sonny fled, as did, presumably, other patrons present. Palermo testified that when he arrived at Dorothy's Cafe downstairs on Monday, Corradino said to him, "You didn't see nothing; you don't know nothing," and Palermo agreed. Palermo soon afterwards moved to Oregon.

Corroborating the police observation of Abate and Miss Ciaramello was the testimony of Miss Ciaramello (granted immunity from prosecution) that on Monday she visited the upstairs area with Abate; he told her the cleanup man had not shown up and so the upstairs needed to be cleaned. Abate cleaned the bathroom and card area and washed the floor with disinfectant.

Following are the results of the police search as introduced at the trial. The police found stains on the up-

Miss Mann testified that Barry did not return home Saturday night or Sunday. Barry's mother testified that Barry failed to appear at her home on Sunday afternoon for their customary weekly family dinner. All this testimony was consistent with the range of time of death indicated by the medical examiner.

stairs bathroom sink, which on testing were determined to be blood. They also found blood on a number of items seized: a mop found downstairs, a polyethylene sheet and a piece of tissue found on the upstairs bathroom floor, a piece of linoleum from the top of the stairs to the second floor, a box found upstairs, old shoes, wood shavings, a door found in a storage room upstairs (a new door had been installed on the upstairs bathroom), and scrapings from between floor boards in the storage room. The police detected the strong odor of sylphonathol, a disinfectant, upstairs and seized a bottle of it; upon analysis it turned out to bear Abate's fingerprints.

3. The defendants' *Bruton* arguments, that each defendant suffered fatal prejudice through the admission of statements made by and admissible against the other, but inadmissible hearsay as to him, stands on the proposition that the judge's limiting instructions, which he was careful to give when admitting each such statement, could not be sufficiently curative, and that a severance of the joint trial was essential. The Supreme Court has made clear that not every introduction of a statement at a joint trial which is admissible against only one of the defendants, but tends to implicate the other, requires reversal. *Harrington* v. *California*, 395 U. S. 250, 253-254 (1959). *Schneble* v. *Florida*, 405 U. S. 427, 430-432 (1972). *Brown* v. *United States*, 411 U. S. 223, 231 (1973). In the *Schneble* case the court said, "[W]e must determine on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury,' *Harrington* v. *California, supra,* at 254, whether . . . [the statements] were sufficiently prejudicial . . . to require a reversal. . . . In this case, we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had . . . [the statements] been excluded. The admission into evidence of these statements, therefore, was at most harmless

error." 405 U. S. at 432. In *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 7-8 (1973), we said the question whether severance was required turned on the strength of the inculpation of the codefendant produced by the statement. See *Commonwealth* v. *Devlin,* 365 Mass. 149, 160 (1974).

At the pre-trial hearing, the defendants moved to sever on the basis of a summary of four statements the prosecution intended to offer which might raise *Bruton* problems. One was a statement by Abate to one Jean LeGallo at 2 A.M. on May 7 that "Barry and Mike had a fight the day before." The judge ruled the statement inadmissible. The other three statements were held admissible and the motion to sever denied; as each statement was introduced at trial, the motion to sever was renewed,[8] and denied, and the judge gave his cautionary instruction.

We see no error in the admission of a statement by Abate to a Chelsea police officer during the week after the search to the effect that "[t]he police found the blood from a fight on the floor." The most direct and strongest evidence of blood on the premises came from police testimony, and whatever Abate's statement may have indicated about his own knowledge that a fight had occurred, it added nothing to the case against Corradino.

The statement, mentioned above, by Corradino to Palermo on Monday morning that Palermo "didn't see nothing" could have had no substantial prejudicial effect on Abate. Palermo's main testimony was that he saw the shooting. On this he was closely cross-examined. Corradino's statement could possibly have enhanced Paler-

---

[8] The renewal of the motions for severance during the trial was not a mere formality, for developments at trial could have made the possibility of prejudice more acute than it appeared to be beforehand. Although error as to the *Bruton* issue was assigned only to the denial of the pre-trial motions, we take it to extend to the renewed motions during trial.

mo's credibility, and thus affected Abate, but we think it at most a detail, even if the relevant limiting instruction is overlooked.

The last "statement" consisted of testimony that Abate telephoned one Timothy Connolly, who had been upstairs on the morning of May 6, but hung up when Connolly asked about Barry. While this could hurt Abate by indicating guilty knowledge, it was, we think, without significant impact on Corradino.[9]

4. On the last day of trial, the jury, contrary to normal practice, were brought into the court room ahead of the defendants who appeared "in custody." When counsel questioned this, the judge said the precaution was taken because on the previous evening, as the jury passed Corradino on their way out, one juror had heard Corradino say, "I did not do it. I did not do it." Counsel made no further objection to the procedure; he did not ask for interrogation of the jurors as to what they had seen, or for an instruction. Counsel sought, however, to have the jurors questioned as to whether they had discussed the case among themselves the previous evening. The judge refused the request. It is not reversible error to omit to instruct that the jury should refrain from discussing the case unless this is shown to result in prejudice, see *Commonwealth* v. *Coleman,* 366 Mass. 705, 711-712 (1975); the present situation is no more plausible for reversal. In itself, a defendant's bare statement that he is innocent does not appear hurtful to him or his codefendant. Compare *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 748 (1975).

5. (a) As ground for a new trial, the defendants said they were misled about Palermo's correct name until he took the witness stand. The prosecution had named him

---

[9] A few statements besides those dealt with at pre-trial were objected to on *Bruton* grounds when offered at trial, but were admitted. We do not discuss them separately. In our view neither defendant suffered any material prejudice from their introduction.

in its list of witnesses furnished to the defense as Robert
Palermo, not as Carmino Robert Palermo. But this was
immaterial for both defendants knew Palermo and
understood he was the person who would testify.

The defense urged also that the prosecution, either
intentionally or through negligence, had not supplied the
information that Palermo had been convicted of bigamy
in Illinois in the 1950's and had later violated parole and
left Illinois so that he was still a "fugitive from justice."
The prosecution had been ordered, pursuant to a pre-trial
defense motion, to make "every reasonable effort" to
furnish the defense with the prior records of its witnesses.
According to testimony at the new trial hearing by
Detective Robert Patenaude of the State police, the in-
vestigating officer for the District Attorney on this case,
normal practice was followed in obtaining the records of
witnesses by requesting copies of their probation records
from the State probation department. These records
reveal with assurance only Massachusetts convictions. A
copy of Palermo's record thus obtained was seasonably
delivered to the defense. The prosecution did not seek
records of out-of-State convictions. Such inquiry may be
reasonable practice when known facts suggest that a
witness has a record elsewhere, but we do not think it
negligence amounting to constitutional error to omit to
make broadcast inquiries in the absence of that kind of
knowledge. Nor do we think the pre-trial order con-
templated such an effort. Although Palermo did mention
to the prosecution something about a bigamy "arrest" or
"record," he said the incident had occurred in Massachu-
setts. Asked whether he had ever lived out-of-State, he
appears to have replied in the negative. When the
Massachusetts record revealed no conviction of bigamy,
the Commonwealth could reasonably have dropped the
matter on the assumption that only an arrest had
occurred; extreme caution might have suggested a further
inquiry, but omission to press the matter was not
culpable neglect, much less intentional suppression of

evidence. See *Commonwealth* v. *Lewinski*, 367 Mass. 889, 897-900 (1975). Cf. *Giglio* v. *United States*, 405 U. S. 150 (1972).

Nor is it remotely likely that the Illinois bigamy conviction, if put before the jury, would have carried weight with them. We may assume arguendo that the conviction would have been admissible for impeachment because Palermo can be said not to have finished serving his sentence, see G. L. c. 233, § 21; but we cannot suppose that commission of bigamy about twenty years in the past by a man now aged sixty-seven and living with a wife would much affect a jury. It would have added very little to other unavailing defense efforts to attack Palermo's credibility.

(b) The defense offered two new potential witnesses, William DeSimone and Timothy Mitchell, said to have been not previously available, who would testify that no shooting had occurred at the critical time and place. Affidavits from both men offered on the new trial motion recounted, in substantially similar words, that the affiant was present at the card game in the room above Dorothy's Café from 3 A.M. until 9 A.M. on the morning of May 6, and that Barry played cards from 3 A.M. to 7 A.M., when he went to the bar and stayed until he fell, knocking over a bar stool, at 7:30 A.M., whereupon he left the building. But on a motion for a new trial "[t]he weight and import of . . . affidavits . . . [are] for the trial judge's discretion"; even if undisputed, the affidavits need not be accepted as true; and the trial judge is "entitled to make use of his knowledge of what had taken place at the trial." *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 543 (1971). Here the judge could consider the fact that the affidavits were contradicted by testimony of several trial witnesses that Barry was not playing cards at 3 A.M. or thereabouts. Moreover, the judge heard live testimony on the motion from DeSimone (Mitchell being again unavailable) which he could assess as an indication of the value of all the new evidence

proffered.  DeSimone said that in April, 1973, he went to Dorothy's "a couple of times a week," and that he sometimes went upstairs to play cards (his affidavit stated that he "frequently visited the second floor"), but that since May 6, 1973, he had never visited the upstairs, and had visited the café below only "a couple of times."  This testimony was offered to explain why DeSimone had not learned of the murder charge against Corradino until after the trial, more than nine months after the shooting allegedly took place.  We think the judge could properly reject this part of the story as incredible, and accordingly disregard the rest of it, particularly as DeSimone was unable to select a picture of Barry out of a group of photographs although he claimed to know him well.

6. In discharge of our duty under G. L. c. 278, § 33E, we have reviewed all the evidence of which the substance has been outlined above.  We find no reason to disturb the jury's verdict of murder in the second degree as to Corradino.

*Judgments affirmed.*