**COMMONWEALTH**
v.
**Thomas W. GATLEY**

**Criminal Nos. 69705-69711**

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

**February 13, 1981**

**FINDINGS, RULINGS AND**

## ORDER ON THE MOTION OF DEFENDANT THOMAS W. GATLEY TO SUPPRESS

### Introduction

The defendant is charged in the above-numbered indictments with two offenses of receiving a stolen motor vehicle, with two offenses of receiving stolen property, with two offenses of conspiracy to receive a stolen motor vehicle and with conspiracy to receive a stolen jack.

### Findings of Fact

After a hearing on the above motion held on November 26, 1980, from the evidence by way of testimony, exhibits and inferences therefrom, I find the facts relevant and material to the relief sought by the defendant in his motion as follows: On October 25, 1977, Joseph W. Smith, an experienced and competent detective with the Brockton Police Department, drove with a colleague, a Detective Reardon, to a barn, which doubles as a garage, situated on Hall Street in the City of Brockton. Detectives Smith and Reardon went there for the purpose of speaking with a person named Douglas Jennings and with the defendant in connection with Smith's investigation of the following incidents.

Detective Smith had learned that during the first week in October, a William Bearce had placed an advertisement in the Brockton Enterprise in order to sell his 1974 Jeep Wagoneer which had a bright yellow exterior and a black interior. In response to the advertisement, Bearce's home was telephoned by a person who indicated that his name was Douglas Flemming, that he was interested in seeing the Jeep Wagoneer and that his telephone number was 587-7054. Bearce later telephoned that telephone number, asking for "Flemming," spoke with him and provided to "Flemming" directions to his home. On October 7, 1977, "Flemming" and a female person, with Bearce's permission, took the Jeep Wagoneer for a

one-half hour road test. When he returned, "Flemming" indicated to Bearce that he liked the Jeep, that he wished to purchase it and that he would seek a bank loan to do so. The next day Bearce's Jeep Wagoneer was stolen. During Detective Smith's investigation of the theft of the Jeep Wagoneer, Bearce described "Flemming" as a white male, approximately 30 years old, balding, with thick sideburns and neatly dressed. Jennings "fitted" that description. Detective Smith had learned from Detective Reardon that the telephone number 587-7054 was listed to an Elizabeth Garcia, Jennings' sister-in-law, who lived at 16 Burdett Road, Brockton, where Jennings and his spouse also resided. Jennings was "well-known" to Detective Smith, and when Detective Reardon during the investigation visited and asked Jennings' spouse if she and Jennings had test-driven Bearce's automobile, she indicated in response that she could not remember. Bearce had also identified Jennings from a "mug shot" as the male person who had test driven his Jeep Wagoneer. Detectives Smith and Reardon had also learned that Jennings had been working on automobiles at the barn/garage on Hall Street.

When on October 24, 1977 Detectives Smith and Reardon arrived at the barn/garage, they observed two persons in the front yard. One of those persons was Jennings, who knew Detective Smith to be a Brockton police detective and who, when he observed Detectives Smith and Reardon pulling up in their automobile, bolted into woods nearby. The other person, a Robert Orr, remained in the front yard. While pulling up to the barn/garage, Detectives Smith and Reardon also observed in the front yard a station wagon without tires and with parts and pieces of automobiles in and about the station wagon. The door of the barn/garage was open and Detective Smith could see inside where he observed motors, tires, jacks and many other parts and pieces of automobiles scattered about. When Detectives Smith and Reardon approached Orr, he, (Orr) began to walk into the barn/garage, and Detectives Smith and Reardon left their automobile and followed Orr into the Barn/garage. Orr then turned to them and stated "Don't touch anything without a warrant." Detective Smith then asked Orr "Who is in charge?", and Orr said in response "Gatley, come back when he is here." Detectives Smith and Reardon began to leave, and as they were leaving Detective Smith pointed to a motor on the floor and asked who did it belong to. Orr said in response that it belonged to himself and that it came from a Plymouth Roadrunner. Orr than asked Detectives Smith and Reardon to leave for the reason that he was "closing up." Detectives Smith and Reardon then left and Orr closed and locked the door of the barn/garage. When they arrived outside Detective Reardon then asked Orr "What's this (the station wagon without tires) used for?" Orr indicated in response that it was used as a rubbish bin for old parts. Detective Smith then removed parts and pieces of automobiles from the station wagon and from the ground nearby. Those parts and pieces included a door panel and a quarter panel which appeared to be from a Jeep Wagoneer. As of that time, according to Detective Smith, he had no substantial evidence against the defendant "which could hold up in Court." Detective Smith then brought those parts to an American Motors dealer in Whitman and the dealer's manager identified most of the items seized by Detective Smith as being from a 1973 or 1974 Jeep Wagoneer. Later that day Bearce identified those same items as being of the same color as his Jeep Wagoneer.

On the next day, October 25, 1977, Detective Smith went to the District Court of Brockton, made an affidavit setting out in substance the above facts, obtained a warrant, searched the barn/garage,

seized several items and made a return. See Exhibit No. 1. During the afternoon of October 25, 1977, while Detective Smith was conducting a search pursuant to Exhibit No. 1, the defendant arrived at the barn/garage. Detective Smith asked the defendant whether or not the barn/garage was his and he (the defendant) responded that he had rented it. Although Detective Smith considered the defendant a suspect at that time, he neither arrested him nor advised him of his rights. Detective Smith stated to the defendant that the items which he had seized were stolen and the defendant said in response that they were not. On October 28, 1977, Detective Smith went again to the Brockton District Court, made an affidavit setting out in substance the above facts plus facts relating to items seized pursuant to Exhibit No. 1 and determined subsequently to be stolen, obtained a warrant, again searched the barn/garage, seized several items and made a return. See Exhibit No. 2. On October 29, 1977, the defendant came to Detective Smith's office at Detective Smith's request.

In his motion to suppress the defendant claims that the initial (October 24, 1977) search of the barn/garage "was done without probable cause or authority of a search warrant." The defendant says that this initial search "violated his Constitutional right to be free from an unreasonable search and seizure" and claims that the subsequent search and questionings of the defendant were a consequence of that first illegal search and tainted by the purported first illegal search. The defendant by way of relief seeks to suppress from evidence all parts and tools seized from the barn/garage and the surrounding area and any statements (of which there was no evidence) that the defendant made to the Brockton Police.

### Rulings of Law

The defendant's motion to suppress should be denied. The defendant's Fourth Amendment rights were not violated as he did not have a legitimate expectation of privacy in the area searched. **Rawlings v. Kentucky,** U.S., 100 S.Ct. 2556, 2561, 65L.Ed.2d 633 (1980); **Rakas v. Illinois,** 439 U.S. 128, 143 (1978).

Although the cases cited by the Commonwealth did not raise the issue of the defendent's "standing"[1] it is, in my view, the dispositive issue. However, as the "standing" issue is a close one, and as the cases cited by the parties indicate that they regard the issue as being whether the search and seizure can be justified by the "plain view" doctrine, that doctrine's applicability to the present case will also be discussed.

### I. STANDING

In cases such as the present one, where the evidence was taken from an area outside the defendant's premises, the analysis traditionally hinged on whether the area was categorized as an "open field", which was not protected by the Fourth Amendment, **Hester v. United States,** 265 U.S. 57, 59 (1924), or as being within the curtilage, which was so protected, see **e.g., Commonwealth v. Thomas,** 358 Mass. 771, 774 (1971). However, since **Katz v. United States,** 389 U.S. 347 (1967), which held that Fourth Amendment analysis does not rest entirely on the nature of the place searched, the curtilage — open fields distinction is no longer the focus of the inquiry; instead, the issue is whether, under all of the circumstances, the defendant had a legitimate expectation of privacy in the "invaded" place. **Id.** at 353; W.R. La

---

[1]The Court in **Rakas v. Illinois,** 439 U.S. 128 (1978) announced that what was previously referred to as "standing" is now "subsumed under substantive Fourth Amendment doctrine". Id. at 139. However, the inquiry remains the same; **viz.** "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Id. at 140. For convenience sake this threshold requirement will be referred to as "standing."

Fave, **Search and Seizure,** Sect. 2.4 at 336 (1978); W.E. Ringel, **Searches and Seizures,** whether or not the barn/garage was his and he (the defendant) responded that he had rented it. Although Detective Smith considered the defendant a suspect at that time, he neither arrested him nor advised him of his rights. Detective Smith stated to the defendant that the items which he had seized wer stolen and the defendant said in response that they were not. On October 28, 1977, Detective Smith went again to the Brockton District Court, made an affidavit setting out in substance the above facts plus facts relating to items seized pursuant to Exhibit No. 1 and determined subsequently to be stolen, obtained a warrant, again searched the barn/garage, seized several items and made a return. See Exhibit No. 2. On October 29, 1977, the defendant came to Detective Smith's office at Detective Smith's request.

In his motion to suppress the defendant claims that the initial (October 24, 1977) search of the barn/garage "was done without probable cause or authority of a search warrant." The defendant says that this initial search "violated his Constitutional right to be free from an unreasonable search and seizure" and claims that the subsequent search and questionings of the defendant were a consequence of that first illegal search and tainted by the purported first illegal search. The defendant by way of relief seeks to suppress from evidence all parts and tools seized from the barn/garage and the surrounding area and any statements (of which there was no evidence) that the defendant made to the Brockton Police.

## Rulings of Law

The defendant's motion to suppress should be denied. The defendant's Fourth Amendment rights were not violated as he did not have a legitimate expectation of privacy in the area searched. **Rawlings v. Kentucky,** U.S., 100 S.Ct. 2556, 2561, 65L.Ed.2d 633 (1980); **Rakas v. Illinois,** 439 U.S. 128, 143 (1978). Arrests and Confessions Sect. 8.4 at 8-25 (1979).[2]

When judged by that standard, the defendant's claim must fail. Detectives Smith and Reardon first observed the car parts while pulling up to the barn. The parts would apparently have been visible to anybody driving up to the barn/garage to pay a business or social call. No attempt was made to keep them in areas less accessible to the public, such as, for example, the back of the barn/garage. In such instances, where "the police come on to private property to conduct an investigation ... and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." La Fave, Sect. 2.3 at 322-23 and cases cited therein.

Several factors confirm this conclusion. The police approached the area openly and in daylight. **United States v. Miller,** 589 F.2d 1117, 1133 (1st Cir. 1978), **cert. denied, Miller v. United States,** 440 U.S. 958 (1979). There are no indications of any effort on the part of the individuals who worked in the barn/garage to exclude

[2]At the time of the seizure of the car parts in this case defendants charged with crimes of possession were entitled to claim "automatic standing" to challenge the legality of the search which produced the evidence against them. **Jones v. United States,** 362 U.S. 257 (1960). The defendant in the present case would not be entitled to automatic standing under **Jones,** however, since the rule applied only where the offense charged possession of the seized evidence at the time of the contested search and seizure." **Brown v. United States,** 411 U.S. 223, 229 (1973). The defendant was charged with receiving stolen property; it is not necessary to prove possession of the stolen goods in a prosecution for that offense. G.L. c.266, §60; J. Nolan, Criminal Law, 32 M.P.S., §362 at 210 (1976). Accordingly, it is unnecessary to decide whether **United States v. Salvucci,** U.S. 100 S. Ct. 2547, 65 L.Ed.2d 619 (1980), which overrules the "automatic standing" doctrine of **Jones,** applies retroactively.

people from the area in which the police made their observations. **Air Pollution Variance Board v. Western Alfalfa Corp.,** 416 U.S. 861, 865 (1974). It also appears from one of the photographs (Exhibit 4) that the area in question was visible from a neighbor's land. Ringel, Sect. 8.4 at 8-26 and cases cited at n. 142. Finally, the police were not entering the land to search, but to question suspects. **Miller, supra,** at 1134.

Other factors that would aid in the analysis were not disclosed by the evidence. There is no evidence as to whether the path travelled by the police to get to the barn was the normal access route; whether there were chains or fences around the property, **Miller, supra,** at 1134; whether the land was posted with "no trespassing" signs, **id.;** whether any of the people who worked in the barn had attempted to exclude the police on prior occasions, **Ouimette v. Howard,** 468 F.2d 1363, 1365 (1st Cir. 1972); or whether the area in question was visible from a public road, **United States v. Santana,** 427 U.S. 38, 42 (1976); Ringel, Sect. 8.4 at n. 142. The paucity of the evidence is to the defendant's detriment, for even in the case of a warrantless search and seizure it is the defendant's burden to prove that he had a legitimate expectation of privacy in the invaded area. **Rawlings v. Kentucky,** U.S. — 100 S. Ct. 2256, 2561, 65 L.E.2d 633 (1980); **Rakas v. Illinois,** 439 U.S. 128, 131, n.1. (1978).

Two factors weigh in the defendant's favor. First, as a tenant of the premises, the defendant had a right to exclude others from the property. The Court noted in a footnote to **Rakas** that "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." **Rakas, supra,** at 144, n. 12. However, later in the same footnote the Court cited, among other cases, **Hester,** the "open fields" case, for the proposition that "even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon." **Id.**

Secondly, it appears from the photographs that the station wagon and car parts were quite close to the barn. The proximity of the area in question to the structure was the key inquiry in the traditional "curtilage" analysis, La Fave, Sect. 2.3 at 321, and it retains much importance in the "legitimate expectation of privacy" inquiry. Ringel, Sect. 8.4 at 8-26 to 8-27. However, proximity alone is not enough to confer standing. In **United States v. Santana,** 427 U.S. 35 (1976), the defendant was arrested in the doorway of her house. The Court held that "(s)he was not in an area where she had any expectation of privacy ... She was not merely visible to the public but was as exposed to public view, speech, hearing and touch as if she had been standing completely outside her house". **Id.** at 42.

The defendant could also argue that even if he lacked standing to challenge the "search", he nonetheless could contest the "seizure" of his "effects". This argument, however, also fails. At no point did the evidence disclose any possessory or proprietary interest of the defendant in the car parts. While it may be a harsh rule to require a defendant to testify at a suppression hearing as to his ownership or possession of contraband or stolen property, especially since the testimony is probably admissable for impeachment purposes at trial, **United States v. Salvucci,** U.S. 100 S. Ct. 2547, 2555, 65 L.E.2d 619 (1980) (Marchall, J., dissenting), this is the present state of the law since the "automatic standing" doctrine of **Jones** was overruled by **Salvucci.**

Even if the defendant did testify as to his possession of the car parts, however, the result would probably remain unchanged. In **Rawlings v. Kentucky,** — U.S. — 100 S. Ct. 2556, 65 L.E.2d 633 (1980), the defendant sought to suppress

some drugs seized from a purse. There was no question that the drugs belonged to the defendant; the purse, however, belonged to another individual. The Court acknowledged that the defendant's ownership of the drugs was "one fact to be considered", 100 S.Ct. at 2562; however, it held that he could not challenge the search or seizure because he had no legitimate expectation of privacy in the purse, which the Court deemed to be the controlling factor. **Id.** at 2561.

## II. PLAIN VIEW

If the defendant had "standing" to raise possible Fourth Amendment violations he would argue that the warrantless seizure was invalid because none of the exceptions to the search warrant requirement were applicable. It would be the Commonwealth's burden to prove that the seizure was justified under the "plain view" exception. **Commonwealth v. Cefalo,** 1980 Mass. Adv. Sh. 1877, 1890.

In order to meet its burden the Commonwealth must prove (1) that the police had a legitimate reason for being on the premises unconnected with a search directed against the accused; (2) that the discovery of the seized items was inadvertent; and (3) that it was immediately apparent to the police that they had evidence before them. **Coolidge v. New Hampshire,** 403 U.S. 443, 446-70 (1971); **Commonwealth v. Cefalo, supra,** at 1889.

### A. Did the police have a legitimate reason for being on the premises?

Had the police's primary purpose for going to the barn been to search for stolen car parts without a warrant they obviously would not have had a legitimate reason for being on the premises. **Coolidge, supra,** at 466; **Miller, supra,** at 1134. However, as previously discussed, Detective Smith testified and I find that his primary purpose for going to the barn

on October 24 was to question Gatley and Jennings. Assuming credence is given to this testimony the issue becomes whether or not the police who, uninvited, drive onto a suspect's land in order to question him can be said to be legitimately on the premises.

"(A)ccording to one source (a 1967 Opinion of the Attorney General) a police officer cannot go on private land to make an **investigation,** without consent, but can go on private land to make an arrest." K. Smith, **Criminal Practice and Procedure,** 30 M.P.S. Secs. 115 at 75 (1970) (emphasis in original). However, more recent federal cases have upheld such investigatory entries onto private land. In **United States v. Brown,** 457 F.2d 731 (1st Cir. 1972), police drove onto the defendant's property to question him about some stolen automobiles that had been seen in some woods near his property. They subsequently discovered more stolen automobiles in the defendant's yard. Discussing the propriety of the initial entry onto the property the Court held that "even in the absence of probable cause the police were entitled to pursue their investigation and go on to the land to question (the defendant)." **Id.** at 733. See also, **Miller, supra,** at 1133; **United States v. Knight,** 451 F.2d 276, 278 (5th Cir. 1971). Accordingly, the Commonwealth has met its burden on this issue.[3]

[3]Some of the cases which discuss the question of whether the police were legitimately on the property analyze the issue in terms of whether the defendant had a legitimate expectation of privacy in the premises. See, **e.g., Miller, supra,** at 1134; **Ouimette v. Howard,** 468 F.2d 1363, 1365 (1st Cir. 1972). However, as previously discussed, the "legitimate expectation of privacy" test is now invoked to determine whether a defendant can raise the Fourth Amendment issues at all. **Rakas, supra,** at 143. In my view the tests should not be identical; otherwise the defendant will be out of court on the motion to suppress after failing only the first prong of the three-part **Coolidge** test. The more appropriate question is whether, in the performance of their duties, the police were legitimately on the premises **despite** any expectation of privacy the defendant may have had.

## B. The "Inadvertence" requirement

### 1. Does this requirement apply to the states?

The portion of Justice Stewart's opinion in **Coolidge** that discussed the requirement that the discovery of the seized item be inadvertent was concurred in by only three justices. The Supreme Judicial Court made note of this in **Commonwealth v. Cefalo,** 1980 Mass. Adv.Sh. 1877, 1889, n. 9; the Court further noted that because that portion of **Coolidge** was not a majority, and because of the "difficulty" of the requirement, at least one other court has held that the "inadvertence" requirement was not binding on the states. **State v. Pointer,** 95 Idaho 707, 712 (1976); **Cefalo, supra,** at 1889, n. 9. Despite its hints to that effect, however, the **Cefalo** court did not abandon the doctrine; it continued to recognize it as one of the prongs of the **Coolidge** test.

### 2. Does the requirement apply to stolen goods?

In the portion of **Coolidge** discussing the "inadvertence" doctrine Justice Stewart remarked that "this is not a case involving contraband or stolen goods or objects dangerous in themselves." **Id.** at 472. Justice White in dissent interpreted that statement as holding that the "inadvertence" doctrine was inapplicable to those types of goods. **Id.** at 519. A few lower courts subsequently followed Justice White's reasoning. See, cases collected at **United States v. Liberti,** 616 F.2d 34, 36 (1980). The Second Circuit has hinted it will do the same in a future case, **Liberti, supra,** at 37; the First Circuit has apparently still adheres to the requirement. **Miller, supra,** at 1134 (marijuana discovered in plain view; court briefly discusses the fact that the discovery was inadvertent).

The Supreme Judicial Court applied the "inadvertence" doctrine explicitly in a case involving the "plain view" seizure of guns, **Commonwealth v. Walker,** 370 Mass. 548, 557 (1976), and implicitly in a case involving the "plain view" seizure of stolen checks, **Commonwealth v. Haefeli,** 361 Mass. 271, 281-82 (1972) **habeas corpus granted sub. nom., Haefeli v. Chernoff,** 394 F. Supp. 1079 (D. Mass. 1975), **rev'd.,** 526 F.2d 1314 (1st Cir. 1975). **See also Commonwealth v. Bond,** 1978 Mass. Adv. Sh. 1241, 1246. However, in **Commonwealth v. Accaputo,** 1980 Mass. Adv. Sh. 1009, the Court, without citing **Walker** or **Haefeli,** unequivocally held that the "inadvertence" requirement does not apply to contraband, stolen goods, or objects dangerous in themselves. **Accaputo, supra,** at 1021. Since sufficient evidence was adduced at the hearing to find that the car parts were stolen, the inadvertence requirement is inapplicable. **Accaputo, supra,** at 1023.

### 3. Was it immediately apparent to the police that they had evidence before them?

At first blush it would appear that the behavior of Detectives Smith and Reardon was inconsistent with a finding that it was immediately apparent to them that the car parts they took were from the stolen Jeep Wagoneer. The officers did not pursue Jennings, who had run into the woods. Furthermore, their bringing the parts to the American Motors dealer for identification militates against a conclusion that the nature of the car parts was immediately apparent to them.

However, although the phrase "immediately apparent" is used in **Coolidge, id.** at 466, a more lenient standard had evolved. The Supreme Judicial Court has held that evidence found in plain view may be seized "if the officers recognize it to be plausibly related as proof to criminal activity of which they were already aware." **Commonwealth v.**

**Bond,** 1978 Mass. Adv. Sh. 1241, 1247.[4] This language suggests a "probable cause" standard, and in fact the United States Supreme Court has recently stated that the seizure of "plain view" evidence "is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." **Payton v. New York,** — U.S. —, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980).

Although the issue is a close one, I would find that the police did recognize the parts to be plausibly related to the theft of the Jeep Wagoneer. It should first be noted that they had probable cause to believe that Jennings had stolen the automobile when they entered the premises on October 24, 1977. The fact that the Jeep had been stolen the day after Jennings had test-driven the car and expressed an interest in it; his use of a false name; his wife's statement to the police that she "could not remember" if she test-drove the car; and Detective Smith's knowledge of Jennings' general reputation are more than a sufficient "congeries of items" to establish probable cause. **Commonwealth v. Corradino,** 368 Mass. 411 (1975).

There was also probable cause to believe that Jennings would store the parts at the barn. In analyzing whether a suspect may have stored the goods he has stolen in a particular place, factors to consider are "the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." La Fave, sec. 3.7 at 709, quoting from **United States v. Lucarz,** 403 F.2d 1051, 1055 (9th Cir. 1970).

When viewed in this light, it is reasonable to assume that the barn would be the most likely place for Jennings to bring the car. It was his place of business, and it was an ideal place to break the car up into parts, switch parts with other vehicles, or otherwise conceal its identity. It would have been unlikely that Jennings would have stored the car at his home for at least two reasons. First, the risk of detection would have been too great. Cf. **United States v. Melvin,** 569 F.2d 492, 498 (1st Cir. 1979). Second, from their knowledge of Jennings' reputation the police could also reasonably have inferred that he did not intend to keep the car for personal use, but rather planned to sell it.[5]

However, even if the police had probable cause to believe that the stolen Jeep Wagoneer could be found on the property, it is still a very close issue as to whether there was probable cause to believe that the car parts eventually seized were from the Jeep Wagoneer. The cases on this issue are not close, and are therefore of little aid. It is obvious, for example that blood-stained clothes found in the vicinity of a person suspected of a violent crime, **Commonwealth v. Meehan,** 1979 Mass. Adv. Sh. 710, 718, cert. dismissed as improvidently granted, —U.S.—, 100 S.Ct. 44 (1980), or clothes matching the description of the perpetrator of the crime, **Commonwealth v. Moynihan,** 1978 Mass. Adv. Sh. 2654, 2661, are recognizable as being plausibly related to criminal activity.

The issue must be determined on the basis of whether or not the car parts had sufficient identifying features to lead the police to believe that the parts were plausibly related to the stolen Jeep Wagoneer. In my opinion there were sufficient features, albeit barely so. First, Jeeps are not the most common cars

---

[4]A second standard, inapplicable here, permits the seizure of evidence which "bespeaks the likelihood of some criminal conduct of which the officers may have had no prior awareness." **Bond, supra,** at 1247.

[5]It should be noted in passing that since the police had probable cause to believe that the stolen Jeep Wagoneer could be found on the premises, their "discovery" of it cannot be categorized as inadvertent. **Cefalo, supra,** at 1889. Thus, if the "inadvertence" requirement were applicable the police would not be able to justify the seizure under the "plain view" rule.

found in this area, and it is reasonable to infer that their parts would have a different size and shape than other cars. Second, the car parts were yellow, as was the stolen vehicle. Third, the October 25, 1977 affidavit in support of the application for the search warrant stated that the officers observed that the fender had recently been burned from the car. The fact that some of the seized parts proved not to be from the Jeep Wagoneer does not by itself change the result. **Commonwealth v. De Masi,** 362 Mass. 53, 56 (1972).

### ORDER

The defendant's motion is **ORDERED** denied, as he did not have a legitimate expectation of privacy in the area searched. Even if he did have "standing" to raise the Fourth Amendment issues, the seizure of the car parts is justified under the "plain view" doctrine.

**Paul Garrity**
**Justice of the Superior Court**