Bohn, J.
INTRODUCTION
This matter is before the Court for resolution of the defendants’ motion to suppress evidence seized from the search of the Ellis & Ellis law offices in Worcester, Massachusetts on May 2, 1996.[2] In their motion to suppress, the defendants argue that all the evidence seized on May 2, 1996 from their offices at 16 Norwich Street and 44 Front Street, as well as evidence seized from the firm’s storage facility at 3 Chestnut Street, all of which are located in the city of Worcester, should be suppressed because the search was improperly executed. Alternatively, the defendants argue that various categories of seized documents should be suppressed because the affidavit filed in support of the application for a search warrant failed to set forth probable cause or contained false statements or material omissions, was not sufficiently particular, and failed to provide for the protection of privileged documents. Finally, the defendants argue that the evidence must be suppressed because the assistant attorneys general who applied for the warrant were not disinterested prosecutors.
The Commonwealth opposes the defendants’ motion to suppress, arguing that the warrant was executed consistently with its terms and was otherwise proper in all respects.
In October, November, and December 1998, this Court heard testimony and received exhibits regarding the execution of the warrants.[3] In January 1999, the parties argued their respective positions concerning those elements of the motion that did not require an evidentiary hearing.[4]
The defendants’ motion will be ALLOWED in part and DENIED in part.
FINDINGS OF FACT
Based on the evidence presented during the six days of hearing regarding the preparation and execution on May 2, 1996 of the search warrants, and on reasonable inferences to be drawn from that evidence, the following facts are found:
I. FINDINGS OF FACT REGARDING EVENTS PRECEDING THE ISSUANCE OF THE SEARCH WARRANTS
In the late fall of 1995, and based on information acquired throughout the course of a three-year investigation by Bruce Spencer of the Massachusetts Insurance Fraud Bureau (“IFB”), the Insurance Fraud Division of the Attorney General’s Office (“IFD”) began preparation for a search of the Worcester, Massachusetts law offices of Ellis & Ellis.[5] That search was to be conducted in the spring of 1996.
- In late March or early April of 1996, Lieutenant Robert A. Friend Jr., a state trooper assigned to the Criminal Bureau of the Office of the Attorney General, was asked to assist with the preparation and execution of the warrants necessary to institute the proposed search. To that end, Friend met on several occasions with Spencer, discussed with him his affidavit in support of the warrant, discussed Friend’s own affidavit, and fixed the method and structure of the law office search. Among other things, Friend determined the appropriate number of personnel needed to ensure timeliness and orderliness of the search, determined the nonpersonnel resources that would be required, designed a method of maintaining contact with the legal staff of the Office of the Attorney General, and prepared a program to insure that the persons supervising the search were properly briefed as to the nature and scope of the search. Friend also collected information about the layout and contents of the buildings to be searched, and the time that employees were present in the offices. In this latter regard, Friend was aware from information provided by Spencer that employees frequently entered the office early in the morning using a key.[6]
On April 24, 1996, IFD attorneys Michael Cullen and John Ciardi, Friend, and Spencer met with Superior Court Justice Diane Kottmyer to discuss the search warrant affidavit and issuance of the warrant. Although Friend’s original plan called for the search to be conducted at 4:00 in the afternoon, Friend discussed with the judge at this meeting his wish to enter early in the morning, before the office was occupied by clients and employees. From his conversation with Judge Kottmyer, Friend believed that his request to enter the Ellis & Ellis offices early in the morning would be incorporated into the language of the warrant.[7] On April 25, 1996, a briefing session was held at the Office of the Attorney General with those persons who would be involved in supervising the Ellis *431 & Ellis search. Friend convened this meeting to ensure that floor monitors, i.e., those troopers assigned to supervise the search of a particular floor, had a working knowledge of the law regarding attorney-client privilege and an understanding of how that privilege would be protected in the course of the search. To accomplish that goal, the following occurred: First, Friend had assembled for each officer a “briefing manual” which contained copies of the various schedules to the search warrants. The briefing manuals also set forth the duties of the searching officers and the safeguards for the protection of privileged material.
Second, Assistant Attorney General Edward Rapacki, an attorney not involved in the ongoing investigation of Ellis & Ellis, discussed the scope of the warrant and the evidence which was the subject of the search.[8] Rapacki also described the procedure for seizing and sealing privileged documents for later review by the magistrate. Troopers were to look at the face of the document in a cursory manner to determine whether it concerned one of the clients listed in Schedule B to the warrant and to ascertain if the document appeared to be protected by a privilege. If the trooper could quickly determine upon cursory review that the document fell within the warrant and was privileged, the trooper was to cease looking at the document and it would be immediately sealed. If the trooper was unsure as to the nature of a particular document, the trooper was to stop reviewing it and call the floor monitor. The floor monitor was to conduct the same cursory review of the document as that allowed by the trooper. If an immediate determination as to privilege could not be made by the floor monitor, the floor monitor was instructed to call Rapacki. Rapacki would then make the final decision with regard to privilege.
Third, Assistant Attorney General David Marks briefly spoke with the floor monitors about the privilege issue and the importance of conducting a careful search, particularly with reference to issues relating to law firm confidentiality.
II. FINDINGS OF FACT REGARDING THE ISSUANCE AND EXECUTION OF THE SEARCH WARRANTS ON MAY 2, 1996
On May 1, 1996, some seven days after the meeting between representatives of the prosecution team and Judge Kottmyer, Judge Kottmyer issued two warrants to search the offices of the Ellis & Ellis law firm, the first located at 16 Norwich Street, Worcester and the second at 44 Front Street, Worcester. Schedule A to the warrants included detailed descriptions, with photographs, of the premises to be searched. The particular list of items to be seized was appended to the warrants as Schedule B. That Schedule authorized the searching troopers to seize discrete catego. ies of documents relating to eight employees and seventeen clients, and permitted the troopers to seize bookkeeping records, nurses’ records, and bank account information. Schedules C and D to the warrants set forth the protections for privileged documents and for computerized records.
The two warrants were executed on May 2, 1996. On that date, a third warrant was also issued and executed at the law firm’s storage facility located at 3 Chestnut Street, Worcester. The evidence seized as a result of the search pursuant to these three warrants is the subject of defendants’ motion.
A. 16 Norwich Street, Worcester
On May 2, 1996, Friend arrived at the State Police Barracks in Grafton, Massachusetts at 5:00 a.m. When all members of the search party were present, Friend conducted a second briefing, explaining to everyone present that the search that would be conducted was of a sensitive nature, in that it involved a law firm. Assistant Attorney General David Marks spoke about the scope of the warrant. Assistant Attorney General Ed Rapacki spoke about the importance of respecting the attorney-client privilege. Rapacki told those present that if they had any questions about whether any document they were reviewing was privileged, they were to stop immediately and inform the floor monitor. If the floor monitor questioned whether the document was privileged, Rapacki would be called. The briefing manual prepared by Friend was distributed to all participants in the search. The briefing manual contained a copy of the schedules to the warrant, which listed the items to be seized.
At approximately 7:00 on the morning of May 2, 1996, Friend and others approached the glass doors to the front of the law office at 16 Norwich Street. Earlier in the morning, Trooper Martin T. Foley had observed a woman enter the building through the front door with the use of a key. This occurred at approximately 6:40 a.m. Foley also knew that the woman he had seen enter the building had not left by the time the search team arrived. Friend knocked on the door first with his fist. When he did not receive any answer, he knocked on the door with a flashlight. He then rang the doorbell located on the left side of the outside door. After receiving no answer to his knocks and rings, Friend used his cellular telephone to call the telephone number for the law firm with the hope that someone inside the building would answer the phone. There was no response. Friend then directed Trooper Foley to the back of the building to see if entry could be gained there. This attempt at entry was not successful.
Shortly thereafter, the remaining search participants arrived, parking their cruisers along sidewalks of Norwich Street. Friend walked to the garage adjacent to 16 Norwich Street to see if entrance could be gained through the garage, but could not locate a door to the interior of the Ellis & Ellis offices. Friend also spoke with the garage attendant, who informed him that the glass front door was the only way into the office.
*432 At approximately 7:14 a.m., after knocking on the front door of the law firm several times over the course of fifteen minutes, after dispatching an officer to the rear of the office to attempt entry without success, and concerned about the possible destruction of evidence by any employees that he believed were inside the office, Friend took a hammer (about 24 inches long with a solid head) and broke the glass to the front door to the law office. He reached inside the door, released the deadbolts, opened the door, and entered. Immediately after entering, Friend instructed the floor monitors to go to their assigned floors, locate each computer, and disconnect the modems. These steps were intended to block any outside access to the computer system and thus prevent possible destruction of the contents of the system.[9]
After entering the building, Trooper Walter Carlson, the floor monitor for the second floor, proceeded directly to the second floor as instructed. When Carlson reached the second floor, he observed a woman on the other side of an interior glass door. He knocked on the door, identified himself as a state trooper, and informed her that he had a search warrant. She admitted him to that floor.
Contemporaneously, other floor monitors secured their assigned floors. They soon learned that elevators did not stop at certain floors and that the stairway doors to other floors were locked. Carlson asked the woman he found on the second floor, subsequently identified as Ellis & Ellis legal secretary Freeda Vanikiotis, if she had keys to open other doors. Vanikiotis located some of the keys behind the reception desk and used them to gam entry to the third and fourth floors. A key could not be located for the fifth and sixth floors, however, and the troopers broke through the stairwell doors on those floors to gain entry and secure the floor.
As each floor was secured, and prior to the search of each floor, the entire area where the search was to occur was videotaped by Trooper Hanley. Once the taping was completed, Hanley gave the tape to the floor monitor. The search of that particular floor would then begin.
The troopers worked on a flagging system to identify privileged and non-privileged records and other documents to be seized. Orange flags indicated a privileged document; blue flags indicated a nonprivileged item. Hundreds of calls were received for Rapacki to review files for privilege. Once all of the items on a particular floor had been flagged for seizure and stacked, a second videotape was taken by Trooper Hanley prior to the items being boxed for transportation and removed.
Gail Maki, an Ellis & Ellis employee, arrived at the law office shortly after the officers’ entry. She was told that the troopers were conducting a search. When she asked to see the warrant, it was shown to her.
At approximately 8:30 a.m., defendant Nicholas Ellis, a partner at Ellis & Ellis, appeared at the office. The troopers allowed him to enter the lobby area to speak with Friend. Friend showed Ellis the warrant, but told him that he would not be allowed to either copy the document or read it to anyone over the telephone because the warrant and affidavit had been impounded.[10] Ellis reviewed the warrant page by page, and then returned to the beginning of the warrant and began to make notes in his date book. He then made several calls on his cellular telephone. When Ellis began to read the warrant to another unidentified individual in the course of a conversation on his cellular telephone, Friend retrieved the warrant.
Between 9:00 and 9:15 a.m., two attorneys from the Worcester law firm of Bowditch & Dewey arrived. One of the attorneys, Louis Ciavarra, asked Friend for a copy of the warrant. Friend said that Ciavarra could review the warrant, but that Ciavarra could not have a copy of the warrant because it was impounded. Friend and Ciavarra conversed about allowing an Ellis & Ellis employee to answer the telephones. Friend told him that he would not allow anyone in the building while the search was in progress and the request was denied.
Additionally, at approximately 9:00 a.m., an Ellis & Ellis employee named Tracey Spencer appeared and asked whether she could speak with the person in charge. When Ms. Spencer met with Friend, she told him that certain Ellis & Ellis attorneys needed files for court that morning, and asked to be allowed to retrieve them. Friend asked her which particular files were needed and where they were located. After receiving the information from Ms. Spencer, Friend instructed the floor monitor to retrieve the files; however, they could not be found by the monitors. Friend then accompanied Ms. Spencer to the location where the files were maintained, permitted her to locate them and, because the files did not belong to any of the clients listed in Schedule B to the warrant, allowed her to leave the office with the files. Prior to Ms. Spencer’s departure, Friend asked her whether the firm main-tamed an off-site storage facility and she told Friend that she was not aware of such a facility.[11]
At approximately 4:00 p.m., the search of the Norwich Street offices was completed. Once all documents were packaged and sealed, a third video was made to show damage that had occurred in the course of the search. The seized documents were then transported to Boston and, ultimately, locked in a storage facility at the Office of the Attorney General on Portland Street. Among other things, the troopers seized employee files, numerous client files, bookkeeping and payroll records, various banking and loan documents, and computer hardware and peripherals from the Norwich Street office.
*433 B. 44 Front Street, Worcester
The second warrant issued by Judge Kottmyer on May 1, 1996 authorized the search of a satellite office maintained by Ellis & Ellis at 44 Front Street in Worcester. The law firm’s Front Street facility consisted of a few small offices with a conference room, and was located in the same building as the Department of Industrial Accidents. The offices were frequently used by Ellis & Ellis attorneys to meet with clients before or after scheduled DIA appearances.
On May 2, 1996, Troopers Tryon, Fletcher, and Flaherty were assigned the task of executing the warrant at Front Street. They arrived there at approximately 7:00 a.m. At approximately 7:10 a.m., an unknown male individual opened the locked exterior doors of the building, and allowed the troopers to enter. This individual advised the troopers that the maintenance staff for the building arrived at 7:30 a.m.
At about 7:25 a.m., the custodian arrived. Tryon identified himself to the custodian, and told him that he had a warrant to search the Ellis & Ellis offices. The custodian opened the law office door with a master key and the troopers began executing the warrant.
Anthony Ranauro, a claims adjuster employed by Ellis & Ellis, arrived at 44 Front Street at approximately 9:15 a.m. When he entered the office, he saw three individuals in his office: one individual was seated at his desk, one was at the four-drawer file cabinet behind his desk, and the third was standing just inside his office. The individual sitting at his desk had a file open before him. The only “files” in Ranauro’s office were client logs, i.e., loose computer printouts containing all of the necessary information about a client’s case, including attorney’s notes and medical summaries prepared by the Ellis & Ellis nurses. The flies were organized in the cabinet alphabetically, and were not separated into folders.
Ranauro had been to the Norwich Street offices prior to arriving at Front Street and was aware that a search was being conducted. After being informed that those present were state troopers conducting a search, Ranauro asked the troopers if he could have access to computer printouts that he needed to work on that day. The troopers told Ranauro they would bring him the specific printouts that he requested. The troopers allowed Ranauro to work in a small conference room and, when he asked for particular printouts, the troopers immediately retrieved them. Ranauro was at the office for two hours, and was present in his own office for a total of five to ten minutes.
The client logs of Jay Rosenfield and Maya Magidov were seized from the 44 Front Street office.
C. Storage Facility at 3 Chestnut Street, Worcester
At some point in the early afternoon of May 2, 1996, State Police Sergeant Brian Kennedy found a card index in the reception area of the 16 Norwich Street office which contained clients’ names and alphanumeric location designations for closed files. A receipt was also found in the basement area which alerted the troopers to the location of an off-site storage facility. Based on this information, Friend called Trooper Mary Sennott, the desk officer at the Grafton Barracks, and instructed Sennott to apply to Judge Kottmyer for a warrant to search the storage facility. Before Sennott executed her affidavit in support of the search warrant, a call was made to the storage facility to determine whether Ellis & Ellis stored documents there. The manager reported that Ellis & Ellis maintained a two thousand square-foot space which contained thousands of records and furniture. After securing the warrant from Judge Kottmyer, Sennott went to the Chestnut Street storage facility and met with Troopers Murphy, Jennings, Foley, and Tryon. Sennott spoke with the facility’s manager and showed her the warrant. The manager brought them to the Ellis & Ellis storage area and the troopers executed the search warrant. The troopers knew they would be looking for client files and, for that reason, would seal and orange-tag the files as presumptively privileged.
The client files of Norman Frigo, James J. Reilly Jr., Ronald D’Auteil, Federico Williamson, Richard Drapeau, and Maya Magidov were seized and sealed after the search of the storage facility, along with copies of checks made payable to Jay Rosenfield.
Additional facts will be described in the discussion which follows.
DISCUSSION AND RULINGS OF LAW
In their motion to suppress, the defendants have challenged the validity of the search warrants issued on May 1, 1996, the manner in which those warrants were executed on May 2, 1996, and the legitimacy of the persons prosecuting this case. In doing so, they invite this Court to review the seizure of each discrete document in the context of each discrete argument. As the basis for requesting such a focused analysis, the defendants point to the fact that the search at issue in this case was that of a law office, thus raising unique issues of client confidentiality, attorney-client privilege, and the need to protect an attorney’s work product.
The Commonwealth does not dispute the premise that the search of a law office requires special care. The Commonwealth argues, however, that the test is one of reasonableness; and, that an evaluation of reasonableness must take into account the totality of the circumstances. The Commonwealth is correct. See Illinois v. Gates, 462 U.S. 213, 233; Commonwealth v. Krisco Corp., 421 Mass. 37, 41-42 (1998).
The rulings of law of this decision will begin with a preliminary determination of standing, a necessary precursor to any person’s right to challenge a search or seizure. The Court will then analyze the warrant itself and determine whether it was supported by *434 probable cause, was sufficiently particular, and provided for the required protection of privileged documents. Third, the Court will review the execution of the warrants on May 2, 1996, and consider the reasonableness with which the state police searched the defendants’ law offices and seized documents. Fourth, the Court will discuss briefly the issue of the relationship between the IFD attorneys and the insurance industry, an issue disposed of previously by this Court.
I. DISCUSSION AND RULINGS OF LAW REGARDING STANDING TO CHALLENGE THE SEARCH AND SEIZURE
In its supplemental opposition to defendants’ motion to suppress physical evidence, the Commonwealth questions the standing of every party to the motion except as follows: (1) the Commonwealth concedes that James N. Ellis Jr. and Nicholas J. Ellis, as named partners of Ellis & Ellis, have standing to challenge the search and seizure of those materials of which they have not disavowed knowledge or ownership; and, (2) the Commonwealth concedes that the clients of Ellis & Ellis have standing to challenge the search and seizure of their own client files. To the extent that the above clients were also Ellis & Ellis employees, however, the Commonwealth questions their standing to object to the search and seizure of their personnel and payroll records because, the Commonwealth argues, they did not have an expectation of privacy in those files.
The protection of the Fourth Amendment attaches to people, not places, and the following factors are to be considered in deciding whether a person has a reasonable expectation of privacy in a particular place and, therefore, whether the person has standing to challenge a search or seizure: whether the place is a common area, whether it was freely accessible to others besides the person challenging the search, and whether the person challenging the search controlled access to the area. Krisco Corp., 421 Mass. at 42; see also Commonwealth v. Welch, 420 Mass. 646, 653-54 (1995); Commonwealth v. Panetti, 406 Mass. 230, 232 (1989). A defendant who has disavowed ownership and knowledge of a particular category of seized materials, however, is not permitted to challenge the seizure of those materials. United States v. Meyer, 157 F.3d 1067, 1079-80 (7th Cir. 1998).
In Mancusi v. DeForte, 392 U.S. 364, 369 (1968), the United States Supreme Court addressed the issue of standing in one’s place of employment, holding that if a defendant occupied a private office and records had been seized from his desk or filing cabinet, he would have standing to challenge the search. A reviewing court must also consider “(1) the employee’s relationship to the item seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether the employee took actions to maintain his privacy in the item.” United States v. Anderson, 154 F.3d 1225, 1232 (10th Cir. 1998).
With those general principles in mind, a more specific analysis of standing follows:
A.Standing of James N. Ellis Jr., Nicholas J. Ellis, and James N. Ellis Sr.
The Commonwealth concedes that James N. Ellis Jr. and Nicholas J. Ellis have standing to challenge the search and seizure of any materials seized from the law firm “which they have not disavowed knowledge or ownership of . . .”[12] See Meyer, 157 F.3d at 1079-80. The Commonwealth nevertheless challenges James N. Ellis Sr.’s standing to contest the search of the law firm.
The trust established to hold title to the Norwich Street offices entitles James N. Ellis Sr., as one of several trustees, to “have the powers with respect to all real and personal estate at any time held by them as if they were the absolute owners thereof.” Further, Ellis maintained an office there at all times, had keys to the office, and stored his former clients’ files at the law firm. After a review of these circumstances, it is clear that James N. Ellis Sr. had an expectation of privacy with respect to certain documents contained in the building and that he has standing to contest the search at issue.
B.Standing of Employees
In this case, the individual employees who have been indicted had no control over the administrative records or client files of the law firm. The files were open and accessible to any employee in the law firm who had occasion to use a particular file. None of the employee defendants has established that the documents that they seek to have suppressed were maintained in such a way that would entitle him or her to any privacy in the document. As such, this Court finds that the employee defendants cannot establish a reasonable expectation of privacy in the client files, payroll records, and personnel files and, therefore, do not have standing to suppress those documents.[13]
C.The CLEO and ALPHA Loan Documents
In his deposition, James N. Ellis Jr. denied that he had any interest in the Cleo Loan Company. Having disclaimed any ownership or possessory interest in Cleo, James N. Ellis Jr. cannot now argue that he has a reasonable expectation of privacy in the loan company’s documentation. See Rakas v. Illinois, 439 U.S. 128, 143 (1978); Meyer, 157 F.3d at 1079-80.
Ellis also denied that the firm of Ellis & Ellis had any interest in the Cleo Loan Company. The Commonwealth asserts that this statement also negates the standing of Lenora Ellis and James N. Ellis Sr. to challenge the seizure of the Cleo Loan Company documents; however Lenora Ellis has filed an affidavit indicating that she owned and operated the Alpha Loan Company and the Cleo Loan Company. For that reason, Lenora Ellis has met her burden of establish *435 ing her standing to challenge the seizure of the loan documents.
Unlike Lenora Ellis, James N. Ellis Sr. has not established any ownership interest or control over the loan companies. The only allegation of “control” advanced by James N. Ellis Sr. is that he had a key to the bookkeeping area where the loan records were kept. That fact is insufficient to establish an ownership interest or control which would entitle him to a reasonable expectation of privacy in the loan company documents. Until he can establish such control or ownership, he has not met his burden of establishing standing to challenge the seizure of those documents.
II. DISCUSSION AND RULINGS OF LAW REGARDING THE SUFFICIENCY OF THE WARRANT
In their motion to suppress evidence, the defendants argue that the searches of the law offices and storage facility were unreasonable, in violation of the Fourth Amendment to the United States Constitution and Articles Twelve and Fourteen of the Massachusetts Declaration of Rights in that A) the affidavit in support of the warrant application failed to set forth probable cause to justify issuance of the warrant or removal of the search from the general preference for subpoenas as an instrument to discover documents maintained by a law office; B) the warrant itself was not sufficiently particular; and C) the warrant failed to set forth reasonable procedures for the review and seizure of privileged documents.
A. The Issue of Sufficient Probable Cause
In this section of the opinion, the Court will first discuss, in general terms, the principles of probable cause and a defendant’s entitlement to a Franks hearing. In what has evolved into a lengthy analysis, the Court will then apply those general principles to the discrete documents to which the defendants take issue.
1. The Principles of Probable Cause: Nexus, Subpoena Preference, and the Need for a Document-by-Documents Analysis
The review of the defendants’ motion regarding probable cause requires the evaluation of that notion in two different contexts. First, the Court must find probable cause to support issuance of the warrant, that is, probable cause to believe that a crime has been committed and that evidence of that crime would be found in the place to be searched (the “nexus” test). Second, the Court must find probable cause to remove the search from the statutory preference for a subpoena under G.L.c. 276, §1, that is, probable cause to believe that the attorney defendants in this case were, at the time the warrant was sought, committing or about to commit a crime. In both evaluations, the Court must determine whether a document-by-document analysis is required.
a. The Nexus Test
As a general rule, an affidavit in support of a warrant authorizing a search must contain probable cause to believe “that the items sought are related to the criminal activity under investigation, and that the items reasonably may be expected to be located in the place to be searched at the time the search warrant issues.” Commonwealth v. Wilson, 427 Mass. 336, 342 (1998). More specifically, an affidavit in support of a search warrant application must provide a nexus between (1) the criminal activity under investigation, (2) the items to be seized, and (3) the place to be searched. Commonwealth v. Jean-Charles, 398 Mass. 752, 757 (1986), citing Commonwealth v. Cefalo, 381 Mass. 319, 328 (1980). Furthermore, in the case of a search for client files in a law office, which are presumptively privileged, the affidavit must establish, by a preponderance of the evidence, that the lawyer’s services were sought to enable the client to perpetrate what the client knew, or reasonably should have known, to be a crime or fraud. Purcell v. District Attorney for the Suffolk District, 424 Mass. 109, 112-13 (1997).
In the present case, the criminal activity under investigation focused on allegations of insurance fraud initiated or facilitated by attorneys and employees of a law firm. The items to be seized included files of clients believed to be involved in the various fraudulent schemes, financial records showing the flow of money to various providers who were part of the schemes, medical records maintained by those involved in the fraud, and other related documents. As discussed more fully below, it was reasonable to expect that those items would be located in the offices searched.
b. Subpoena Preference
Where applicable, G.L.c. 276, §1 states that:
. . . [N]o search warrant shall issue for any documentary evidence in the possession of a lawyer, psychotherapist, or a clergyman . . . who is known or may reasonably be assumed to have a relationship with any other person which relationship is the subject of a testimonial privilege, unless, in addition to the other requirements of this section, a justice is satisfied that there is probable cause to believe that the documentary evidence will be destroyed, secreted, or lost in the event a search warrant does not issue. Nothing in this paragraph shall impair or affect the ability, pursuant to otherwise applicable law, to search or seize without a warrant or to issue a warrant for the search or seizure of any documentary evidence where there is probable cause to believe that the lawyer, psychotherapist, or clergyman in possession of such documentary evidence has committed, is committing, or is about to commit a crime.
*436 As discussed more fully below, this Court finds that the necessary probable cause was established to believe that the lawyers in possession of evidence in this case had committed, were committing, or were about to commit a crime, thus removing this case from the statutory preference for discovery by subpoena.
c. Document-by-Document Review
In their motion to suppress, the defendants argue that the Court must find the required nexus and the G.L.c. 276, §1 probable cause with respect to each document seized or, at least, with respect to each category of documents. This Court does not agree.
The law in Massachusetts is such that an affidavit in support of an application for a search warrant should be viewed in the totality. Cefalo, 381 Mass. at 330; Commonwealth v. Stewart, 358 Mass. 747, 751 (1971). There is no requirement that an affidavit establish probable cause for each document seized. Id. See also Andersen v. Maryland, 477 U. S. 463, 479 (1976) (seizure of all business’s records held proper because “proof of similar acts” admissible to show intent); United States v. Wuagnewc, 683 F.2d 1343, 1353 (11th Cir. 1982), cert. denied, 464 U.S. 814 (1983) (officers can remove intact folders when one document within the file fell within warrant’s scope).
In the present case, the affidavit filed in support of the search warrant application established probable cause to believe that the items sought were in the place to be searched; established probable cause to believe that the target clients had committed insurance fraud; and established by a preponderance of the evidence that Ellis & Ellis attorneys were complied in that fraud. Thus, probable cause was sufficient to seize every document naming those target clients, and a document-by-document review is not required.
2. The Franks Issue
In their motion to suppress, the defendants argue that the affidavit in support of the application for the warrant contained knowing or reckless material omissions or false statements, thereby entitling them to a hearing on whether the affidavit contained such omissions or false statements and whether it was nevertheless supported by probable cause.
If a defendant makes a substantial preliminary showing that (1) an affiant made a false statement either knowingly or intentionally or with reckless disregard for its truth, and (2) at least, in the case of a reckless falsehood, the misstatement is necessary to the existence of probable cause, a defendant is entitled to a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). See Commonwealth v. Ramos, 402 Mass. 209, 215 (1988). The same principles apply where an affiant omits material facts from an affidavit. United States v. Hadfield, 918 F.2d 987, 992 (1st Cir. 1990); United States v. Parcels of Land, 903 F.2d 36, 46 (1st Cir. 1990). The allegation entitling the defendant to a Franks hearing must involve some substantive portion of the affidavit. Commonwealth v. Bennett, 39 Mass.App.Ct. 531, 534 (1995), rev. denied, 422 Mass. 1101 (1996).
As discussed more fully below in the case-by-case analysis, the Court finds that the defendants are not entitled to an evidentiary hearing because they have not presented sufficient evidence that the affidavit in support of the warrant application contained knowing or reckless false statements or material omissions that affected a substantive portion of the affidavit.
3. Particularized Findings and Rulings Regarding Probable Cause to Seize Specific Documents Seized
Given the general principles discussed above, the following findings and rulings are made concerning probable cause to seize particular documents:
a. Federico Williamson/Federico Alonso Files.
Williamson reported a workers’ compensation claim for injuries he received on November 13, 1991. Six months later, Williamson, this time using the name “Federico Alonso,” made a claim for injuries he received in an automobile accident. Williamson/Alonso reported the claims using different social security numbers[14] and the different names. The use of two different names for the same individual for two different accidents was known to employees of Ellis & Ellis. Further, when seeing a doctor about his later motor vehicle claim, Williamson/Alonso informed the doctor that he had had no previous accidents or traumas. Moreover, there is evidence that Williamson/Alonso was working as a construction laborer while simultaneously reporting to his workers’ compensation insurer that he had received no earnings. Further, in connection with a February 22, 1990 motor vehicle accident, Williamson claimed total disability. The law firm submitted the claim for total disability, despite the fact that the intake sheet for Williamson indicated that he was working “under the table” for a construction company.
Because, there is unrebutted evidence that employees of Ellis & Ellis were aware that Williamson/Alonso was pursuing two different claims under two different names and were aware of their obligation to bring the previous injuries to the attention of the insurance carrier, there was probable cause to believe that the defendants were complicit in Williamson/Alonso’s fraud and that his Ellis & Ellis files would contain evidence of that fraud. That Spencer’s affidavit omitted the fact that “Alonso” is Williamson’s mother’s family name does not negate this probable cause.
The defendants contend that Spencer’s affidavit recklessly omitted that Williamson’s on-the-job injury involved trauma to his head, neck, and shoulders, and that Williamson’s second motor vehicle accident involved trauma to the lower back. That Spencer omitted this information is not material, however, because when asked about any previous accidents or traumas, *437 Williamson answered in the negative. The defendants also contend that Spencer misrepresented Williamson’s employment with Malu Construction. They claim that Williamson only worked a few hours at Malu during the time in question and that the fact that Williamson was issued a traffic citation while driving a Malu Construction truck does not equate to a finding that he was working at Malu. The earnings report, however, indicates that Williamson earned $910 for the second quarter of 1993, the period at issue. As such, Spencer did not misstate or omit any information concerning Williamson’s employment, and the information that was available to him provided probable cause to believe that Williamson was in fact working at Malu Construction while claiming disability.
These facts thus establish probable cause to seize all files concerning Williamson/Alonso. Furthermore, no showing has been made that would entitle the defendant to a Franks hearing on the Williamson /Al-onso files. Finally, the affidavit established probable cause to believe that Williamson was utilizing the law firm’s services to commit a fraud, that his files at the law firm would contain evidence of that fraud, and a preponderance of the evidence that Ellis & Ellis employees were aware of that fraud. The Williamson/Al-onso documents will not be suppressed.
b. David Formoso/Denis Milan Files
Spencer’s affidavit states that on March 25, 1989, as Denis Milan, Formoso filed a claim for an on-the-job injury at Victoiy Button. While collecting total disability benefits from Victory Button as Denis Milan, he worked as David Formoso at the Malu Construction Company and at the Westford Regency Hotel. On November 17, 1989, as David Formoso, he made a claim for an on-the-job injury at the Regency Hotel. At the time Formoso/Milan filed his second claim, he was continuing to claim total disability from the first injury.[15] The law firm of Ellis & Ellis represented Formoso/Milan in both claims and James Ellis Jr. admitted that he was aware that Formoso and Milan were the same person.
This information in the affidavit demonstrates probable cause to believe that Formoso/Milan had committed a crime, that the claim files in the possession of the Ellis & Ellis law firm would contain evidence of that crime, and establishes by a preponderance of the evidence that Ellis & Ellis was complicit in the crimes.
The defendants claim that Spencer failed to mention that James Ellis Jr. had a legitimate reason for continuing to represent Formoso/Milan under two different names, i.e., to protect the fact that Milan had entered the country illegally and was now attempting to use his real name in order to attain “alien” status. Such a showing does not rise to the level required by Franks. As such, the documents could be seized, reviewed, and will not be suppressed.
c. James Economou Files
In his affidavit, Spencer contends that Economou’s claims arising from accidents in 1988 and 1992 were fraudulent. With regard to the 1988 claim, Spencer claims that Economou was working while claiming disability. The evidence establishes that Economou began working at Ellis & Ellis in 1990, that his insurance carrier was notified of his change in employment status, and that he was reduced to partial disability as a result of his return to work part-time. Spencer contends, however, that Economou was actually working more hours at Ellis & Ellis than were reported to his insurance carrier. Spencer’s basis for this belief is that Economou’s wife, Alexandra, was listed as an employee of Ellis & Ellis and received compensation from Ellis & Ellis. At Alexandra’s deposition, however, she did not report working at Ellis & Ellis. Spencer reasonably believed that the issuing magistrate could draw a reasonable inference that Alexandra’s failure to report working at Ellis & Ellis at her deposition implied that she never in fact worked at the law firm but, rather, that she was being paid for work done by James. This establishes probable cause to believe that James Economou was committing insurance fraud and establishes by a preponderance of the evidence that Ellis & Ellis was complicit in that fraud.
The defendants claim that Spencer ignored the medical documentation from Economou’s 1988 accident which demonstrated that Economou underwent two surgeries as a result of that accident, and that his MRI report showed problems with his cervical spine. Contrary to the defendants’ contentions, however, Spencer does not state that Economou’s injuries were feigned, only that he may not have been “disabled” from continuing to work. The defendants also claim that Spencer mischaracterized Economou’s wife’s deposition testimony because she was never asked specifically whether she worked at Ellis & Ellis and never specifically denied that she worked there. Alexandra did, however, fail to mention any work that she performed at Ellis & Ellis. The inferences that could be drawn from her failure to testify to employment at Ellis & Ellis were left to the issuing judge.
With regard to the 1992 injury, Spencer claims that Economou failed to disclose his 1988 injuries to the insurance company’s adjuster. While the fact of his non-disclosure alone does not rise to the level of probable cause, when considered together with the other information established by Spencer’s affidavit, probable cause existed to believe that his disability claims were fraudulent, that his Ellis & Ellis files would contain evidence of that fraud, and established by a preponderance of the evidence that Ellis & Ellis was complicit in that fraud.
The defendants have failed to make a substantial preliminary showing which would entitle them to a Franks hearing on the seizure of the Economou files. The documents, therefore, will not be suppressed.
*438 d. Amada Pedroza Files
Spencer’s affidavit states that Amada Pedroza claimed to be working at Donuts N’ More for one week prior to her automobile accident on June 22, 1991. Spencer asked Thomas Gatsogiannis, the baker at the doughnut shop, whether he knew an individual named Amada Pedroza and he replied that he did not. Spencer also pointed to the discrepancy between the amount Pedroza claimed she earned as an assistant baker ($350.00) and the amount Gatsogiannis claimed he earned as the principal baker ($240.00) as evidence of her untruthfulness. Finally, Spencer stated that Pedroza had answered on a medical admission form for her son that she was “unemployed” on a day that she later claimed to have been at work at Donuts N’ More.
The allegations against Amada Pedroza establish probable cause to believe that Amada Pedroza had committed a crime and establish by a preponderance of the evidence that her attorneys were aware that she was using their services to perpetrate a crime, especially in light of the information Spencer had regarding fraudulent wage claims at Donuts N’ More.[16]
The defendants do not assert that there were any knowing or reckless material omissions or false statements made entitling them to a Franjes hearing. The documents will therefore not be suppressed.
e. Maya Magidov Files
Spencer’s affidavit reports that Maya Magidov submitted concurrent wage information to her workers’ compensation insurer claiming that she worked full-time at Elkay Products in Worcester and part-time for Donuts N’ More for three weeks prior to her injury in 1991, earning $300.00 per week at Donuts N’ More. Spencer spoke with Gatsogiannis who told Spencer that he did not know anyone by the name of Maya Magidov. Spencer also spoke with another employee of the doughnut shop who told him that she did not know anyone by that name. Spencer later discovered that Magidov’s payroll checks from Donuts N’ More had been voided by the store, and that other Donuts N’ More employees had no recollection of Magidov working there. This information, considered together with the information Spencer had regarding fraudulent wage claims at Donuts N’ More establishes probable cause to believe that Maya Magidov had committed a crime and that her Ellis & Ellis workers’ compensation file would provide evidence of that crime. This evidence, read in conjunction with all other facts set forth in the affidavit, establishes by a preponderance of the evidence that Ellis & Ellis not only knew of Magidov’s fraud, but were enabling her to commit such fraud.
The defendants do not assert that there were any knowing or reckless material omissions or false statements made with respect to Maya Magidov that would entitle them to a Franks hearing. As such, the documents will not be suppressed.
f.Helen Biliouris Files
Spencer’s affidavit states that Helen Biliouris claimed to have been injured on September 30, 1991, while working at Donuts N’ More. As a result of that injury, she filed a workers’ compensation claim, as well as a premises liability lawsuit against the owner of the property where she fell. Spencer claims that Biliouris was not actually working at Donuts N’ More at the time of her injury and that when her premises liability action was tried in 1996, Biliouris testified that she was totally disabled from September 30, 1991 until she returned to work in October of 1993. Spencer then points to Leo Biliouris’s deposition testimony in May of 1994, in which Leo stated that his wife worked with him at Probe, Ltd., an investigative agency, in October of 1993.
As evidence that Ellis & Ellis was aware of Biliouris’s fraud, Spencer points to the fact that Lawrence Baler, an Ellis & Ellis associate, represented Helen at her trial when she claimed she had not worked until she got her job in October of 1993, and also represented Leo when he testified in May of 1994 that Helen worked with him at Probe, Ltd.
Biliouris was also allegedly involved in an automobile accident on May 14, 1993. Spencer’s affidavit establishes that, when filling out a form for an independent medical examination, Biliouris answered that she had never been injured in an accident before May 14, 1993, an untrue statement in light of her claims arising from the 1991 accident. Spencer’s affidavit further claims that Nicholas Ellis represented to the insurance carrier that Biliouris was totally disabled from the automobile accident from May 14, 1993 to October 26, 1993. Spencer contends that this claim contradicts James Ellis Jr.’s representation in connection with the lump sum proceedings for Biliouris’ workers’ compensation claim in June of 1993 that Biliouris was capable of light duty work.
Spencer’s affidavit thus sets forth sufficient information to establish that Helen Biliouris may have been claiming total disability when it was not warranted and that her claim file at Ellis & Ellis would contain evidence of that crime. These facts also establish by a preponderance of the evidence that Ellis & Ellis may have been aware of and complicit in that fraud. This Court accordingly finds that sufficient probable cause existed to seize all files of Helen Biliouris.
The defendants do not assert that there were any knowing or reckless material omissions or false statements made entitling them to a Franks hearing. The documents will, thus, not be suppressed.
g.Ronald D’Auteil Files
Spencer states in his affidavit that D’Auteil was employed with Westinghouse in September of 1986, and that the day he was fired he informed his employer that he had hurt himself and might be seeking compensation for his injury. Spencer goes on to state that *439 D’Auteil began working at Ellis & Ellis as a claims adjuster at some point in 1990, and intimates that D’Auteil failed to inform Westinghouse that he was no longer totally disabled. Finally, Spencer disputes D’Auteil’s claim that he left his employment with Ellis & Ellis because his back problems were aggravated because D’Auteil contemporaneously opened his own business, a store in Worcester called “The Sporting Look.” This information thus establishes probable cause to believe D’Auteil submitted fraudulent information in support of his continuance of total disability benefits. Further, because Ellis & Ellis was the employer for whom D’Auteil resumed employment, the affidavit established by a preponderance of the evidence that Ellis & Ellis attorneys were aware that he was not longer totally disabled and may have been complicit in the alleged fraud.
The defendants argue that Spencer failed to provide evidence in the affidavit that D’Auteil’s original injury at Westinghouse was valid. Even if this Court were to find that Spencer knowingly or recklessly omitted mention of the validity of D’Auteil’s original injury in his affidavit, that omission does not adversely affect the finding of probable cause. Regardless of the nature of D’Auteil’s injury at Westinghouse, it is his resumption of employment in 1990 that is at issue here; and, the fact that D’Auteil was no longer totally disabled. D’Auteil has, therefore, failed to make a threshold showing which would entitle him to a Franks hearing. As such, the documents will not be suppressed.
h.Leo Biliouris Files
Spencer’s affidavit states that Leo Biliouris was gainfully employed during a period in which he claimed to be totally disabled from an accident at his place of employment on October 24, 1990. Ellis & Ellis handled his disability claim. Spencer claims that, while receiving total disability, Biliouris was working to establish Probe, Ltd., a private investigation agency, and was working at his son-in-law’s restaurant, the Plcadilly Pub. After Biliouris received a lump-sum settlement on his workers’ compensation claim Probe was incorporated These facts establish probable cause to believe that Biliouris was committing insurance fraud, and, in light of the widespread allegations in Spencer’s affidavit, that Biliouris’s files at Ellis & Ellis would contain evidence of that fraud. These facts also establish by a preponderance of the evidence that Ellis & Ellis was complicit in that fraud.
The defendants do not present evidence that any knowing or reckless material omissions or false statements were made, entitling them to a Franks hearing. As such, the documents will not be suppressed.
i.Loan Records
Spencer’s affidavit contained a report from a third party, not a client or current employee, that the law firm was lending money to clients in advance of settlements. The Commonwealth concedes that it did not know at the time of the search that the law firm was conducting an illegal loan business, i.e., advancing money to clients in anticipation of favorable claim or case settlements; and, that it did not know that the seizure of the loan records would establish any intrinsic crime. The Commonwealth’s justification for seizing the loan records was based on its belief that a loan from a lawyer to a client would provide motive for both the lawyer and the client to engage in fraud.
Because the loan records were not “fruits, contraband or instrumentalities,” of a crime, at the time seizure was contemplated, the Commonwealth relies on the “mere evidence” doctrine for seizure of these items. See Warden v. Hayden, 387 U.S. 294 (1967); see also Commonwealth v. D'Amour, 428 Mass. 725, 730-31 (1999) (police may seize evidence in plain view if its incriminating character is immediately apparent). [17] The mere evidence doctrine is intended to allow the police to seize items which are not contraband, instrumentalities, or fruits, but “probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." Warden, 387 U.S. at 307; see also Commonwealth v. Kenneally, 10 Mass.App.Ct. 162 (1980), rev. granted, 383 Mass. 269 (1981) (seizure of mere evidence must be supported by probable cause to believe evidence will aid in apprehension or conviction).
Here, the loan records would not aid in apprehension or conviction for any crime that was under investigation at the time the search warrant issued, but instead provided evidence of an additional crime unknown to the Commonwealth at the time the warrant was issued. The Commonwealth’s argument that loans to clients would somehow provide motive for insurance fraud is weak and unsubstantiated. For that reason, the loan records that were seized under the “advances to clients” provision of the warrant were not supported by probable cause and must be suppressed.[18]
j.Banking Records
The Commonwealth contends that probable cause for the seizure of the bank records is found in the fact that insurance settlement proceeds were forwarded to the law firm in the names of both the attorney and the client. The Commonwealth asserts that tracing the insurance settlement proceeds through the Ellis & Ellis bank accounts could establish the use and control of the proceeds which would be relevant and, in some cases, determinative to the issue of intent to defraud. The Commonwealth argues that the banking records were seized as corroborative evidence of the insurance fraud.
Applying the mere evidence doctrine, control and use of the money is relevant to establish intent to defraud. If nothing else, the receipt and deposit of allegedly fraudulently obtained settlement proceeds shows the assertion of control over the defrauded *440 money. Accordingly, probable cause existed to seize the banking records, including any banking records concerning the CLEO or ALPHA loan company, because probable cause existed to believe that Ellis & Ellis was committing insurance fraud.
The defendants do not present evidence that any knowing or reckless material omissions or false statements were made with respect to banking records entitling them to a Franks hearing. As such, the documents will not be suppressed.
k.Nurse/Medical Logs
In the course of the search of the Ellis & Ellis law offices, the Commonwealth seized the appointment and scheduling logs of all doctors and nurses, as well as the client files of Richard Drapeau, Norman Frigo, and Loretta Cooper.
Drapeau’s involvement in a sting operation with the IFB is detailed extensively in Spencer’s affidavit, as well as his statements to Spencer that two nurses at Ellis & Ellis told him to lie or exaggerate his injuries. Drapeau also told Spencer that he overheard a nurse telling another client how to respond to the doctor’s questions. Spencer states that Frigo told him that Nurse Anne Wall instructed him how to answer questions put to him by the independent medical examiner. Cooper told Spencer that she was offended by the coaching she received from the nurses to exaggerate her injuries. Finally, Dawn Piche, a former Ellis & Ellis employee, informed Spencer that the nurses told her that their job was to tell the client what to say during a medical examination. All of this information suggests a wide-ranging scheme to “coach” clients in defrauding insurance companies. Moreover, there was probable cause to believe that notes concerning the coaching of these clients would be contained in the clients’ files, as well as the identity of the persons who had done that coaching.
Spencer’s affidavit also demonstrated, by a preponderance of the evidence, that the defendants were aware of the coaching of clients prior to medical examinations, and that the practice was encouraged and even demanded by the attorneys. Such a showing is sufficient to overcome any attorney-client privilege that may have existed with respect to the nurses’ logs and appointment books, because this showing established by a preponderance of the evidence that Ellis & Ellis was complicit in this fraud
The defendants do not present evidence that knowing or reckless material omissions or false statements were made, entitling them to a Franks hearing. As such, the documents will not be suppressed.
1.Employment Records of Marie Varney Mandeville and Dawn Piche
The Commonwealth argues that the employment records of these two cooperating witnesses were seized as evidence to corroborate their work histories at Ellis & Ellis. While it is true, as the Commonwealth contends, that documentary evidence need not consist solely of documents which are themselves fraudulent, these records cannot fall under the mere evidence mantle urged by the Commonwealth. The employment records of two corroborating witnesses would in no way aid with the apprehension or conviction of any of the individuals under investigation at the time the warrants were issued and cannot be considered related to the criminal activity under investigation. As such, these records will be suppressed.
m.Bettina Ferreira Files
The Commonwealth represents to this Court that it does not possess any files concerning Bettina Ferreira. Accordingly, as there is nothing to suppress, this Court will not rule on the probable cause or crime-fraud issues implicated by Ferreira’s files.
n.Vivian Delisa Melton Files
Melton admitted her fraud to Spencer, thus establishing probable cause to believe that Melton was committing insurance fraud; however, Melton never implicated Ellis & Ellis in her statement, and Spencer did not provide further information implicating the law firm in Melton’s fraud. The Court finds, therefore, that the Commonwealth has not made a sufficient demonstration that the law firm was involved in Melton’s criminal activity. Thus, there was not probable cause to believe that Melton’s files would contain evidence of that fraud. For that reason, the Melton documents will be suppressed.
o.James J. Reilly Jr. Files
Spencer’s affidavit states that Ellis & Ellis attorney Robert Marquis represented Reilly at a July 29, 1994 lump-sum settlement conference for a 1991 injury. Once Reilly started working again, he was injured on his first day. Marquis again handled the workers’ compensation claim. Spencer’s affidavit states that Marquis should have known that Reilly had claimed to have been permanently disabled from the 1991 injury and that Reilly falsely denied prior similar injuries. When confronted with this information at a March 30,1995 DIA conference, Marquis still pursued the case. When the DIA judge (Sumner, J.) denied payments to Reilly, it was appealed by Ellis & Ellis. This information establishes probable cause to believe that Reilly was committing insurance fraud, that his Ellis & Ellis files would contain evidence of that fraud, and establishes by a preponderance of the evidence that Ellis & Ellis attorneys were complicit in that fraud.
The defendants do not present evidence of knowing or reckless material omissions or false statements that would entitle them to a Franks hearing. As such, the documents will not be suppressed.
p.Jay Paul Rosenfield Files
Spencer’s affidavit includes information concerning Rosenfield received from former Ellis & Ellis employee, Dawn Piche. Piche told Spencer that, of Rosenfield’s *441 thirteen separate personal injury claims, many were pursued simultaneously against different insurers using different doctors. Several of the claims were also pursued using the same doctors on successive claims. On some of the claims, Rosenfield alleged injuries to body parts that he had claimed were injured in earlier or later claims and failed to disclose that fact to doctors. In some claims, Rosenfield denied he was working or had an ability to work, even though he was employed or applying for employment. Many of these false statements were presented to insurance companies by Rosenfield’s attorneys at Ellis & Ellis. These facts establish probable cause to believe that Rosen-field was committing insurance fraud, probable cause to believe that his Ellis & Ellis files would contain evidence of that fraud, and establishes by a preponderance of the evidence that Ellis & Ellis attorneys were complicit in that fraud. That the insurance companies may have known about Rosenfield’s prior injuries, and this was omitted from Spencer’s affidavit, does not negate probable cause to seize Rosenfield’s files and is not sufficient to entitle the defendants to a Franks hearing. As such, the documents will not be suppressed.
B. The Issue of Sufficient Particularity
In addition to challenging the search warrants on the basis of no probable cause, the defendants argue that the searches of the Ellis & Ellis law offices and storage facility were unreasonable, in violation of the Fourth Amendment to the United States Constitution and Articles Twelve and Fourteen of the Massachusetts Declaration of Rights in that the warrants authorizing the searches did not state with sufficient particularity the items to be seized. The Commonwealth asserts that the search warrants were sufficiently particular in light of the broad range of illegal activities allegedly occurring at Ellis & Ellis.
A warrant must “particularly describe” the premises to be searched and the things to be seized. G.L.c. 276, §§1, 2. Article Fourteen of the Massachusetts Declaration of Rights states that “[a]ll warrants . . . [must be] accompanied with a special designation of the persons or objects of search, arrest or seizure.” It is the general rule, however, that “[t]he particularity requirement . . . is to be applied with a practical measure of flexibility and only requires reasonable specificity.” United States v. Shoffner, 826 F.2d 619, 631 (7th Cir. 1987); see also Commonwealth v. Corradino, 368 Mass. 411, 416 (1975) (“it seems good policy to allow a certain leeway or leniency in the after-the-fact review of the sufficiency of applications for warrants”); Commonwealth v. McRae, 31 Mass.App.Ct. 559, rev. denied, 411 Mass. 1105 (1991) (warrants and affidavits must not be si bjected to “hypertechnical scrutiny”). “How detailed the warrant must be follows directly from the nature of the items there is probable cause to seize; detail is necessary only to the extent the judicial officer must limit the search and seizure to those items.” United States v. Hughes, 823 F.Supp. 593, 603 (N.D. Indiana 1993); see also Commonwealth v. Freiberg, 405 Mass. 282, 298 (1989) (degree of specificity required may vary according to circumstances and type of items involved).
The particularity requirement was enunciated in Marron v. United States, 275 U.S. 192, 196 (1927), and is meant to limit the discretion of the officer executing the search warrant. Cefalo, 381 Mass. at 327, citing Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971); see also Freiberg, 405 Mass. at 298 (particularity requirement protects against “exploratory rummaging” by police). The warrant, however, need not be elaborately detailed and need not “minutely identify every item” which may be seized. United States v. Prewitt, 553 F.2d 1082, 1086 (7th Cir. 1977); see also Commonwealth v. Blake, 413 Mass. 823, 827 (1992) (affidavits should be read as a whole, not parsed, severed, and subjected to hypercritical analysis). “[A] description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit.” United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985) (citations omitted); see also Freiberg, 405 Mass. at 298. Exclusion for lack of particularity is required under Massachusetts law only if the constitutional violation is substantial and prejudicial. Commonwealth v. Sheppard (II), 394 Mass. 381, 391 (1985).
It is well established that in cases involving complex fraudulent schemes, the particularity requirement must be read with some flexibility. Wuagneux, 683 F.2d at 1348-50, citing, inter alia, United States v. Timpani, 665 F.2d 1, 5 (1st Cir. 1981). More specifically, in cases “involving complex financial transactions and widespread allegations of various types of fraud, reading the warrant with practical flexibility entails an awareness of the difficulty of piecing together the ‘paper puzzle.’ ” Wuagneux, 683 F.2d at 1349, citing United States v. Vertresca, 380 U.S. 102, 108 (1965). The rationale behind this flexible reading of the particularity requirement is that, in investigations of ongoing fraudulent practices, i.e., those business enterprises “permeated with fraud,” all of the records are likely to be relevant to show the existence of a fraudulent scheme. Kenneally, 383 Mass. at 271 (seizure of all “records and papers” of insurance company upheld because company was operating without a license making “everything it did unlawful”). In addition, it is proper to seize all the records of the enterprise “so that the executing officers have no need to exercise their own judgment as to what should be seized.” United States v. Brien, 617 F.2d 299, 309 (1st Cir.), cert. denied, 446 U.S. 119 (1980). It may also be proper to seize all of the documents of a business enterprise because “proof of similar acts is admissible to show intent or the absence of mistake.” Andresen, 427 U.S. at 483. The Andresen court cited additional Supreme *442 Court precedent for the proposition that “(e)vidence that similar and related offenses were committed in this period tended to show a consistent pattern of conduct highly relevant to the issue of intent.” Id., citing Nissen v. United States, 336 U.S. at 613, 618 (1949); see also United States v. Hershenow, 680 F.2d 847, 851 (1st Cir. 1982) (seizure of “all accident patient files” from doctor’s officer not insufficiently particular despite the fact that warrant described fraud only in relation to automobile accident patients).
Nearly every circuit has adopted the “permeated with fraud” doctrine, i.e., a doctrine that permits wholesale seizure of all records of a business enterprise if there is probable cause to believe the enterprise is participating in widespread fraud. See, e.g., United States v. Humphrey, 104 F.3d 65, 69 (5th Cir. 1997) (warrant for “all records” search of private residence valid in light of pervasive nature of fraud, overlap of business and personal lives, and limitation to financial transaction); United States v. Oloyede, 982 F.2d 133 (4th Cir. 1992) (all files of law firm permissibly seized where warrant established that firm was permeated by fraud); United States v. Bentley, 825 F.2d 1104 (7th Cir. 1987) (when whole business is a fraud, warrant properly may permit seizure of everything agents find because every transaction is potential evidence of fraud); United States v. Kail, 804 F.2d 441 (8th Cir. 1986) (warrant to seize almost all business records justified because there was probable cause to believe fraud permeated entire business operation); United States v. Sawyer, 799 F.2d 1494 (11th Cir. 1986) (search warrant sufficiently particular because business permeated with fraud and fraud affected all customers); United States v. Offices Known as 50 State Distributing Co., 708 F.2d 1371 (9th Cir. 1983) (“general” warrant justified because there was probable cause to believe fraud permeated entire business operation and impossible to segregate those business records that would be evidence of fraud from those that would not); National City Trading Co., 635 F.2d at 1026 (probable cause to believe business permeated with fraud justified seizure of all business records as described in warrant); United States v. Brien, 617 F.2d 307-09 (1st Cir.), cert. denied, 446 U.S. 119 (1980) (seizure of all business records of commodities firm suspected of fraudulent scheme permissible).
While Massachusetts has not specifically adopted the permeated by fraud doctrine, it has embraced the underlying concept that where a business is thoroughly infused with fraud, a warrant authorizing seizure of all records of the business is not overbroad. See Kenneally, 383 Mass at 271 (where entire operation is fraudulent, warrant for and seizure of, all documents permissible).
In the present case, Spencer’s affidavit established probable cause to believe that attorneys at Ellis & Ellis were engaged in a widespread and ongoing pattern of fraud committed against workers’ compensation and motor vehicle insurers. The fact that the Commonwealth chose to focus on only seventeen of the firm’s many clients does not dispel the notion that the firm’s business was “permeated with fraud” as that concept has been developed. Further, the fact that the warrant specifically identified only those seventeen client files means only that the warrant did not allow the troopers to seize unrelated files in a wholesale manner. In the instant case, like that in Shoffner, 826 F.2d at 631, “a more particular description could [have] preclude!d] effective investigation of the crimes at issue.” This Court finds, accordingly, that the warrant was not overbroad or insufficiently particular but, rather, was sufficiently crafted to seize only items for which probable cause had been established in the warrant or which might be regarded as necessary or relevant in proving the fraudulent schemes set forth in the warrant.
C. The Sufficiency of the Procedure for the Review of Privileged Documents
The defendants argue that the procedure for the review of privileged documents set forth in the warrant was constitutionally deficient. Specifically, the defendants contend that the procedure established by the warrant provided insufficient protection for materials covered by the attorney-client privilege, and that the review procedures, even as later modified by Judge Kottmyer, did not provide adequate protection for privileged documents. Their specific arguments are: (1) that, for the search to be the least intrusive possible, it should have been executed when an attorney was present and the search team should have permitted that attorney to locate files listed in the warrant; (2) all documents seized should have been immediately sealed for privilege review; and (3) the search of computerized files should have been supervised by a master and performed in the least intrusive manner possible.
The defendants also urge this Court to find that any post-search privilege review procedure of documents seized from a law firm should meet the following minimum constitutional requirements: (a) the Commonwealth should not be allowed to review documents until no privilege claim is made to that document or until a magistrate rejects that privilege claim; (b) the defendants should have access to all documents in order to assert privilege; c) any determination as to the crime-fraud exception should be made on a document-by-document basis rather than a file-by-file basis; (d) the Commonwealth should be required to prove the application of the crime-fraud exception by a preponderance of the evidence; and (e) the defendants should have access to the search warrant application and to any ex parte submissions made by the Commonwealth in seeking the search warrant.
The Commonwealth asserts that the privileged document review procedure was constitutionally reasonable and adequate to protect attorney-client privileges.
*443 1. The Sufficiency of the Procedure for Review of Privileged Documents During the Search
In a search for business records and documents, a review of the content of the papers must necessarily be allowed in order to determine whether the document falls within the parameters of the warrant. As the Court ruled in United States v. Hunter, 13 F.Supp. 2d 574 (D.Vt. 1998):
Records searches are vexing in their scope, because invariably some irrelevant records will be scanned in locating the desired documents. Such searches spark protests over the amount of discretion given to the searching officers, and these concerns are heightened when the documents include potentially privileged legal materials. A warrant calling for a thorough records search does not necessarily give officers too much discretion, however. Although care must be taken to “minimize[] unwarranted intrusions upon privacy,” . . . records searches “permit! ] officers to examine many papers,” in recognition of “the reality that few people keep documents of their criminal transactions in a folder marked ‘crime records.’ ”
13 F.Supp.2d at 582.
In paper searches, “some perusal, generally fairly brief, [is] necessary in order for the police to perceive the relevance of the documents to the crime . . . ,” United States v. Ochs, 595 F.2d 1247, 1258 (2d Cir. 1979); but, “the perusal must cease at the point of which the warrant’s inapplicability to each document is clear.” United States v. Heldt, 668 F.2d 1238, 1267 (D.C. Cir. 1982). “In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized . . . [Responsible officials, including judicial officials, must take care to assure that [the searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy.” Andresen, 427 U.S. at 483. For example, in Klitzman, Klitzman & Gallagher v. Krut, 744 F.2d 955, 961 (3rd Cir. 1984), the court suppressed evidence seized from a law firm because the warrant permitted a “government rampage [which] potentially or actually invaded the privacy of every client” of the law firm.
In the present case, Schedule C to the search warrants set forth the procedure for the review and seizure of privileged documents. Where applicable, the warrant provides that:
Any document, material, and file referring to, or bearing the name of, any of the individuals listed in Paragraph 4 of Schedule B may be seized and shall be sealed upon seizure. The designated Assistant Attorney General may conduct, or supervise, a limited and cursory review of any potentially privileged material . . . Such potentially privileged materials shall then be sealed and turned over to the custody of the State Police assigned to the Attorney General’s office, without further review or inspection.
Although case law exists supporting the defendants’ position that an attorney could have been allowed to be present during the search, the Commonwealth’s failure to permit an attorney to assist does not rise to the level of a constitutional deprivation. This Court has found that the state troopers conducting the search had legitimate concerns about the presence of employees of the law firm, many of whom were under suspicion of criminal activity. Additionally, the troopers had no reason to believe that the attorneys for the law firm would cooperate fully to produce all of the documents within the parameters of the search warrant. As evidenced by the defendants’ memorandum, the defendants’ interpretation of what documents were beyond the scope of the warrant differed substantially from the Commonwealth’s interpretation. To have required the Commonwealth to utilize the assistance of the law firm’s attorney in conducting the search would undoubtedly have delayed the search, and may have hindered and/or made contentious the quest for the documents within the scope of the search warrant.
Further, no “rampage” was permitted by the terms of the warrant. See Klitzman, Klitzman & Gallagher, 744 F.2d at 961. To the extent possible, given the circumstances of this case, the search of the Ellis & Ellis law offices proceeded in an orderly and systematic way, and the troopers’ review of. files was limited to those files which might have fallen within the scope of the warrant. The troopers in this case had been instructed prior to the search that their review of documents must be minimal, and that if that brief review did not resolve their doubt about the privileged nature of the documents, they were to alert the floor monitor, who might have called Assistant Attorney General Rapacki, both of whom would conduct a similar cursory review. No credible evidence was admitted that showed that the troopers ignored the warrant’s directive. Any intrusion into the defendants’ privacy occasioned by the cursory review was thus necessary to effectuate the warrant.
2. The Sufficiency of the Procedure for Review of Privileged Documents Following the Search
a. Principles Regarding Work Product and the Crime-Fraud Exception
In their motion, the defendants challenge the procedure set forth in the warrant for the review of documents by the court and master which purport to be the attorneys’ work product. [19]
In this case, documents or files for which the Commonwealth had obtained a client waiver of the attorney-client privilege were not subjected to the privilege review procedures or the crime-fraud determination and were automatically released to the Commonwealth. Similarly, documents deemed not privileged *444 during the search were not reviewed by the magistrate and were automatically released to the Commonwealth. The defendants argue that they were entitled to access to these two categories of documents in order to assert a claim of “opinion work product.”
The work product doctrine was formulated to “enhance the vitality of an adversary system of litigation by insulating counsel’s work from intrusions, inferences, or borrowings by other parties as he prepares for the contest.” Ward v. Peabody, 380 Mass. 805, 817 (1980). The doctrine protects an attorney’s legal conclusions and musings from discovery by opposing counsel in the case for which the work product was prepared. The doctrine, however, was not intended to be used as a shield to avoid later prosecution for allegedly illegal activities to which those documents relate.
Neither the Massachusetts state courts nor the United States District for the District of Massachusetts have considered whether the crime-fraud exception applied to documents protected by the opinion work product privilege. But in In Re John Doe, an attorney was the subject of a criminal investigation into alleged subornation of perjury and obstruction of justice in connection with his representation of a client in a criminal proceedings. In Re John Doe v. United States, 662 F.2d 1073 (4th Cir. 1981), cert. denied, 455 U.S. 1000 (1982). The government issued a subpoena to the attorney’s law office, requesting all records relating to Doe’s representation of this particular client. In discussing the rationale underlying the work product doctrine, the court stated that “(n]o court construing [the work produce doctrine] . . . has held that an attorney committing a crime could, by invoking the work product doctrine, insulate himself from criminal prosecution for abusing the system he is sworn to protect.” Id. at 1078; see also In Re Impounded Case (Law Firm), 879 F.2d 1211, 1214 (3rd Cir. 1989) (applying crime-fraud exception to opinion work product).
In the instant case, the defendants’ allegedly fraudulent activities in representing their clients is the premise upon which the Commonwealth bases its prosecution. Disclosure of the documents was sought by the Commonwealth, not for the purposes of gaining a tactical advantage in litigation, but rather, for the purpose of exposing alleged criminal activity. Where, as here, the services the attorney provided to the client are the subject of criminal investigation, the application of the crime-fraud exception to protected opinion work product will adequately ensure that attorneys do not use the work product doctrine as a shield to avoid prosecution for his or her own illegal activities. Therefore, when an attorney invokes the privilege of opinion work product, the Commonwealth must establish by a preponderance of the evidence that the services of the attorney were used to enable the attorney, with or without the knowledge of his client, to commit what the attorney knew or reasonably should have known to be a crime or fraud. See Purcell, 424 Mass. at 112-13.
This Court agrees with the defendants that they are entitled to assert a work product privilege in relation to documents where the Commonwealth had obtained a client waiver of attorney-client privilege, but holds that here, such claims would be unavailing. The “client waiver” files which were not subjected to the crime-fraud review are the files of Loretta Cooper, Richard Drapeau, and Norman Frigo. These clients gave statements to Bruce Spencer that employees of Ellis & Ellis specifically instructed them to exaggerate their injuries during medical examinations. The facts contained in Spencer’s affidavit in support of the search warrant in relation to these particular clients are more than sufficient to establish by a preponderance of the evidence that Ellis & Ellis was engaged in fraudulent and even criminal conduct. The crime-fraud exception therefore compels the disclosure of any opinion work product contained in these clients’ files.
The second category of documents the defendants challenge are those documents designated during the search as not subject to the attorney-client privilege. This category of documents includes financial records, employment records, and other documents that, after a cursory review, the officers conducting the search believed were not privileged. The defendants contend that they should have been entitled to access to these documents to assert claims of opinion work product prior to release of those documents to the Commonwealth.
It would not be feasible, and would indeed be detrimental, to the Commonwealth’s investigation into alleged criminal wrongdoing, to have permitted the defendants to review the entire realm of documents seized for purposes of asserting the opinion work product privilege. This Court is satisfied that the officers performing the search were adequately versed in the various privileges so that few, if any, privileged documents were deemed nonprivileged and subject to immediate release to the Commonwealth.[20] To the extent that the defendants seek to suppress a particular document deemed “non-privileged” as falling within the opinion work product doctrine, subject of course to the constraints of the crime-fraud review, they may renew their motion in the course of trial.
b. Principles Regarding Privilege and the Crime-Fraud Exception
In their motion, the defendants also challenge the procedure set forth in the warrant for the review of documents by the court and master which purport to implicate the attorney-client privilege. The defendants assert that Judge Kottmyer improperly ruled on the crime-fraud exception to attorney-client privilege and argue that each document in each file must be subjected to the crime-fraud determination.
*445 Both federal and state case law developing the law of privilege recognize and protect certain communications between attorney and client. The privilege, while not absolute is often strictly construed and narrowly applied. See, e.g., Commonwealth v. O’Brien, 377 Mass. 772, 775 (1979). The privilege, however, is not constitutionally based, Three Juveniles v. Commonwealth, 390 Mass. 357, 358 (1983), but is “a creature of public policy.” Commonwealth v. Paszko, 391 Mass. 164, 187-88 (1984). A client may waive and release the protection of the attorney-client privilege.
Moreover, where attorney-client communications concern the proposed commission of a crime, any existing attorney-client privilege “vanishes” in the face of the “crime-fraud” exception. In Re Sealed Case, 676 F.2d 793, 812 n.74 (D.C.Cir. 1982). The crime-fraud exception means that if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud, the crime-fraud exception to the attorney-client privilege has been established. Purcell, 424 Mass. at 112.
In the present case, Schedule C to the warrant provides that the proceedings for review and release of materials to the Commonwealth would be ex parte, in camera. Initially, the schedule did not provide for any notice or hearing to the defendants concerning the privilege and probable cause issues. On June 28, 1996, however, Judge Kottmyer modified the privilege review procedure to allow the defendants to review the documents at issue, assert privilege, and submit written memoranda concerning the crime-fraud exception prior to her review.
On August 16, 1996, Judge Kottmyer appointed a special master, Christine M. Roach, to determine whether documents seized under the warrant were protected by the attorney-client privilege. Roach was instructed to turn over all nonprivileged material to the Commonwealth and to make all privileged material available to the defendants for their review. If appropriate, the defendants could then file pleadings with Judge Kottmyer concerning the crime-fraud exception.
In January of 1997, Judge Kottmyer issued written findings of fact and rulings of law concerning the application of the crime-fraud exception to the seized documents. In May of 1997, Judge Kottmyer issued a supplemental memorandum regarding the application of the exception to additional documents. In these supplemental findings, Judge Kottmyer indicated that she had reviewed her previous findings of January 1997 in light of the Purcell decision which required a higher standard of proof for the crime-fraud exception to apply. She stated that she was satisfied that her earlier determination was correct based on a preponderance of the evidence standard. This Court is satisfied with her conclusion.
The defendants’ reliance on In Re Federal Grand Jury Proceedings, 89-10, 938 F.2d 1578, 1582 (11th Cir. 1991), and In Re Richard Roe, Inc., 68 F.3d 38, 40 (2nd Cir. 1995), does not persuade this Court that each individual document should have been reviewed, as opposed to a file-by-file review. Those cases were predicated on fact patterns different than this case. Those cases do not involve the seizure of a client’s file, as is the case here, but instead involve the review of discrete documents.
III. DISCUSSION AND RULINGS OF LAW REGARDING THE EXECUTION OF THE WARRANTS ON MAY 2, 1996.
In their motion to suppress, the defendants argue that the searches of the Ellis & Ellis offices and of the storage facility were conducted in an unreasonable manner, in violation of the Fourth Amendment to the United States Constitution and Articles Twelve and Fourteen of the Massachusetts Declaration of Rights in that the state police did not execute the search during normal business hours, as required by the warrant; that they failed to knock and announce prior to entering the premises, also required by the warrant; that the troopers unreasonably destroyed property; that the firm’s business was needlessly interrupted; that an Ellis & Ellis partner was not permitted to read the warrant; that the troopers read privileged documents; that so many documents were seized beyond the scope as to render the search “general”; and that, simply stated, the Commonwealth’s conduct in executing the search was so outrageous as to warrant suppression of all of the items seized. The Commonwealth asserts that the defendants’ arguments are factually inaccurate and legally flawed, and that the Commonwealth’s conduct in the execution of the warrant was appropriate in all respects.
A. General Principles Regarding the Execution of a Search
In order for a search or seizure to be reasonable, the facts available to the officers at the moment of search or seizure must be such as to warrant a person of reasonable caution in the belief that the action taken was appropriate. Commonwealth v. Harris, 3 Mass.App.Ct. 343, 346 (1975), citing Terry v. Ohio, 392 U.S. 1, 21-22 (1968). No formula exists for determmation of the reasonableness of a search; the reasonableness of each search must be decided on its own facts and circumstances. Commonwealth v. Laudate, 345 Mass. 169 (1962). Both the method of entry and the manner of execution will be considered in the reasonableness determination. Wilson v. Arkansas, 514 U.S. 927, 934 (1995); Dalia v. United States, 441 U.S. 238, 258 (1979).
B. The Determmation of Reasonableness In This Case
1. Time of Day for Execution
The search warrant issued by Judge Kottmyer authorized the search of the Ellis & Ellis law offices to proceed only “during the daytime and normal business hours.” Warrant Schedule C, Paragraph 10. There is no *446 dispute that the warrant was executed during the daytime. See Commonwealth v. Grimshaw, 413 Mass. 73, 81 (1992) (for warrant purposes, nighttime begins at 10:00 p.m. and ends at 6:00 a.m.). This Court must determine, however, whether the search was executed during normal business hours. The evidence established that clients were normally received at the Norwich Street office between the hours of 9:00 a.m. and5:00p.m. That fact, however, does not require a finding that the firm’s normal business hours were confined to that eight-hour period, i.e., the normal business hours of a law firm are not necessarily limited to that period of time in which clients are present. For example, Ellis & Ellis time-cards for nonsalaried employees for the five months preceding May of 1996, admitted into evidence at the hearing on this matter, demonstrate that employees routinely arrived at the office prior to 7:00 a.m.[21] Furthermore, the surveillance conducted by IFB Investigator Albert Fitzgerald in March, April, and May 1996 established that, on each occasion in which he was present, a woman arrived at the offices at approximately 7:15 a.m. or earlier.[22] Finally, in his testimony before the Court, James N. Ellis Jr. stated that he frequently worked at the office from 10:00 p.m. until 5:00 a.m. and that some nights he would continue working through the morning hours. In the present case, therefore, there is little correlation between “normal business hours” and the hours during which clients were normally seen. From the evidence received by the Court over several days of hearing, the 7:14 a.m. entry into the Norwich Street offices was within the normal business hours of the Ellis & Ellis law firm in May of 1996.[23]
Moreover, although this Court did not accept the testimony of Friend to the effect that the issuing magistrate told him, “[y]ou have a daytime warrant, that’s fine” for the truth of the matter stated, this Court did accept that testimony to demonstrate Friend’s state of mind with respect to his decision to enter the premises at 7:14 a.m. A searching officer’s state of mind is significant in determining whether a search is reasonable. Commonwealth v. Ford, 394 Mass. 421, 424 (1985); and it is clear from Friend’s extensive testimony over the course of several days of hearing that he believed he was authorized to enter Ellis & Ellis offices early in the morning, and that the warrant’s provisions did not prohibit him from doing so. Suppression is not warranted where “(t]he procedural letter, not the substantive spirit, of the law was violated.” Commonwealth v. Garcia, 23 Mass.App.Ct. 259, 261 (1986).
Finally, the defendants did not suffer any prejudice from the early morning entry. See Garcia, 23 Mass.App.Ct. at 260-61 (if unauthorized nighttime search conducted, defendant must show bad faith conduct by police or prejudice before items would be suppressed, e. g., police found something that they would not have found during the daytime). In the present case, Friend testified that he would not have allowed law firm employees to assist with the search regardless of the time the search commenced. There would have been no benefit, therefore, in waiting for the employees to arrive. Furthermore, if the troopers had entered the building two hours later, at a time in which clients were present, all occupants, including those clients, would have been ordered to leave. The result of the search would have been the same, but the logistics of dealing with clients, employees, and attorneys would have complicated further an already sensitive search. Friend justifiably believed that an early morning entry would be less intrusive than an entry made later in the day; and that an early morning entry would best protect against the possibility that the evidence sought would be destroyed or compromised, a real possibility given his understanding that computer programs were available to delete all or part of a computer’s hard drive.
Given, the circumstances of this case, the entry at 7:14 a.m. was not unreasonable.
2. Method of Entry
The defendants contend that the state troopers made no attempt to knock and announce their presence prior to breaking through the glass front doors at 16 Norwich Street. They argue that this violation of their constitutional rights requires complete suppression of all items seized during the search. The defendants also claim that the keys to the premises were available to the Commonwealth at their request, and that the troopers’ unnecessary destruction of exterior and interior doors to gain entry to the building and to various venues in the building violated the reasonableness requirements of the Fourth Amendment and Article Fourteen.
The policies underlying the knock and announce rule are intended to decrease the potential for violence, protect privacy, and prevent unnecessary damage to property. Commonwealth v. Cundriff, 382 Mass. 137, 146 (1980), cert. denied, 451 U.S. 973 (1981). Courts have upheld forceful entries for warrants which otherwise require knock and announce procedures in those cases in which the entry by force occurred after the officers knocked, announced, and received no answer. See, e.g., Commonwealth v. Watson, 36 Mass.App.Ct. 252, 258 (1994). Courts have also upheld forcible entries if some exigency creates a need to dispense with the knock and announce requirement, so long as the law enforcement personnel do not “create” the exigency. See, e.g., United States v. Moore, 91 F.3d 96, 98 (10th Cir. 1996); United States v. Mendonsa, 989 F.2d 366, 370-71 (9th Cir. 1993); Niro v. United States, 388 F.2d 535, 539-40 (1st Cir. 1968); Commonwealth v. Forde, 367 Mass. 798, 802 (1975). Suppression of evidence involving destruction of property has only occurred in cases where the destruction was unnecessary to execute the warrant. See, e.g., Lawmaster v. Ward, 125 F.3d 1341, 1349-51 (10th Cir. 1997); Ayeni v. Mottola, 35 F.3d 680, 688-89 (2nd Cir. 1994), cert. denied, 514 U.S. 1062 (1995).
In the present case, the testimony presented at the evidentiary hearing demonstrates that the state police *447 did knock prior to entering the premises. Friend, and several other state troopers who were present at the time, testified that Friend knocked on the door both with his fist and with a flashlight prior to entering, and that he rang the doorbell and called the switchboard. This Court accepts the testimony of the troopers and finds that the state police did knock and did attempt to announce their presence for a reasonable time prior to entering the premises. Accordingly, suppression of evidence is not warranted on this basis.
The search in this case involved a large building with six floors and a basement. The troopers reasonably and properly believed it was necessary to secure the building quickly to prevent any destruction of evidence that might result if the defendants had prior notice of their search or access to the building’s interior during the course of the search. Further delay could have compromised their search.
It may be true in this case that less damage may have occurred if the troopers had waited until staff were present on the premises to assist with the search. But the decision not to do so does not make their entry unlawful or require a finding by this Court that the damage done in this case was unreasonable. Videotapes of the premises before and after the search do not reveal injury that exceeded what was necessary to gain access or that would rise to the level of “unnecessary.”[24] See Lawmaster, 125 F.3d at 1349-51; Ayeni 35 F.3d at 688-89. Consequently, suppression of evidence is not warranted on this basis.
3. The Presence of the Defendants or their Representatives and their Opportunity to Review the Warrant
The defendants argue that the troopers should have waited until attorneys were present at the law firm so they could have directed them to flies or other documents that were the subject of the warrant. The defendants also claim that when Nicholas Ellis requested that he be allowed to review the warrant, the trooper allowed him to do so, but retrieved the warrant when Ellis began copying the names of the clients who appeared in Schedule B. The defendants argue that, because Ellis was not permitted to review the warrant to determine the troopers’ authority to search, all items seized from the search should be suppressed pursuant to Commonwealth v. Guaba, 417 Mass. 746, 755 (1994).
No court in this Commonwealth has stated that it is a requirement, in the execution of a warrant, that the occupant be present. Although the Second Circuit approved a police department policy that a law office would not be searched until the attorney was present, that case did not involve allegations of that attorney’s criminal wrongdoing, National City Trading Corp. v. United States, 635 F.2d 1020, 1025-26 (2nd Cir. 1980); and, there is no constitutional or statutory requirement in the Commonwealth of Massachusetts that a law firm attorney, or any other occupant, be present for the search of a law firm’s premises.
In this case, Friend subjectively believed that the assistance or presence of the attorneys whose offices were being searched would not facilitate the search and could in fact hinder it. This Court agrees with the Commonwealth that it would not have been prudent to rely on the defendants’ assistance in locating client files and other items sought to be seized. Indeed, it would have been unreasonable for the searching officers to rely on the defendants to produce all documents relative to the search warrant. As such, the conduct of the troopers in executing the warrant without the presence of the occupants was proper.
Massachusetts common law suggests that law enforcement officials must possess a copy of the search warrant when executing it. Commonwealth v. Guaba, 417 Mass. 746, 754 (1994). “(T]he presence at the search of documents describing the items to be seized is crucial in order for a warrant to meet the particularity requirements of art. 14 ... ,” because it serves to guide searching officers as to what can be seized and to inform the defendant of the scope of the search. Id. at 753-55. There, however is no requirement that law enforcement officials provide the defendant a copy of the affidavit in support of the warrant application.
In the instant case, at the time of the search, the state troopers did have a warrant that described where they could search and what items could be seized. The troopers did not allow Ellis to copy the warrant because it had been impounded by the court, but they did allow him to review it. Furthermore, the troopers allowed Ellis’s attorney, Louis Ciavarra, similar access to the warrant. The Commonwealth’s investigation of fraud which implicated attorneys, clients, staff and related professionals, was continuing. In light of the need for secrecy in the Commonwealth’s ongoing investigation, the troopers’ refusal to allow Ellis or his attorney the opportunity to copy provisions of the warrant was not unreasonable.
4. The Manner in Which the Warrant Was Executed
The defendants claim that the troopers did not follow the guidelines set forth in the warrant for the protection of privileged material, and that as many as four people reviewed any one document or file before it was sealed for privilege review by the special master or judge. The defendants also argue that it was unreasonable for the troopers to seize an entire binder or file when it contained only one or several of the items identified in the warrant. Those arguments must fail.
First, it is proper for law enforcement personnel to examine documents, “at least cursorily, in order to determine whether they are, in fact, among those papers authorized to the seized . . ." Andreson, 427 U.S. at 482 n.11; see also National City Trading Corp., 635 F.2d at 1025-26 (“[a]lthough a law office search should be executed with special care to avoid unnecessary intrusion on attorney-client communications, it is nevertheless proper if there is reasonable cause to believe that the specific *448 items sought are located on the property to be searched”).
Second, as a general rule, “it is .. . reasonable for the [searching officers] to remove intact files, books and folders when a particular document within the file was identified as falling within the scope of the warrant. . . To require otherwise ‘would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search.’ ” Wuagneux, 683 F.2d at 1353. “[T]he Fourth Amendment [does not] prohibit seizure of an item, such as single ledger, merely because it happens to contain other information not covered by the terms of the warrant.” United States v. Christine, 687 F.2d 749, 760 (3d Cir. 1982), citing United States v. Beusch, 596 F.2d 871, 876-77 (9th Cir. 1979). “This flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records.” Christine, 687 F.2d at 760. If the items within the parameters of the search warrant are so commingled with items beyond the parameters of the search warrant so as to cause trouble distinguishing between the two, wholesale seizure is permitted, provided the items seized outside the scope of the warrant are returned immediately after inspection. United States v. Slocum, 708 F.2d 587, 605-06 (11th Cir. 1983).
In the present case, the troopers were required by the warrant to conduct a cursory review of the contents of the files to see if information contained in a file fell within the scope of the warrant. Of necessity, this cursory review required observation. There is no evidence to show that the observation required of the troopers violated any attorney-client privileges.[25] Furthermore, the possibility that more than one cursory review may have been performed, i.e., the first by a trooper, the second by the floor monitor, and the third by Rapacki, does not convert the reviews into a “reading” or a violation of privilege. Finally, to suggest that anyone involved in the search, including the troopers or Rapacki, would somehow use information gained from a file for their personal benefit or to harm one of the firm’s clients is simply unfounded. As such, the evidence seized will not be suppressed on this theory.
5. The Troopers’ Seizure of Documents Allegedly Outside the Scope of Warrant
The defendants assert that the troopers seized material that clearly fell outside the scope of the warrant. The Commonwealth denies that any document seized was outside the scope of the warrant. In the alternative, the Commonwealth argues that if a document seized was not within the scope of the warrant, seizure of that document was proper under the plain view doctrine. After review, this. Court agrees that some of the documents seized by the troopers were outside the scope of the warrant, cannot be included under a theory of plain view, and must be suppressed.
“Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.” Commonwealth v. D’Amour, 428 Mass. 725, 730-31 (1999), quoting Commonwealth v. Santana, 420 Mass. 205, 211 (1995). Such evidence, termed “mere evidence” as distinguished from contraband, fruits, and instrumentalities of crime, which may be seized because their nexus to criminal activity is obvious, may only be seized “if the officers recognize it as plausibly related to criminal activity of which they already were aware.” Id., see also Commonwealth v. LaPlante, 416 Mass. 433, 440 (1993). The discovery of the seized evidence must have been inadvertent and unexpected from the perspective of the searching officers. D'Amour, 428 Mass. at 731.
As such, the following documents must be suppressed because they do not fall within the parameters of the warrant and are not documents whose incriminating character is immediately apparent: binder labeled “Personnel”; manila folders labeled “Discrimination Info,” “The Prudential,” “Standard,” “401K,” and “Dept. Of Employ. Training”; accordion file labeled “Old Claims June 93 — Dec. 93"; blank columnar pad; ’’Employees Duties"; “Notes of Albert Billings”; “Check Requests”; “Invoice from ALB”; case status lists; profit and loss statements of Ellis & Ellis; “Kelly Lederer Files”; “Names, DOI, Dates, JD#s”; “Alphabetical List”; “Doctors”; blue and grey steno pad; “PIP Info”; Ellis & Ellis Trustee Project; ledger sheets; brown “Log Book”; file folders “7/91,” “Mar. 3/91,” and “6/91"; cash reports for various months; cash flow reports for various months; ’’CLEO Company Trial Balance-December 31, 1990"; two blue Management Series books entitled “Record Book”; reports, folders, and cash receipts journals concerning CLEO and ALPHA Loan Companies; binders and audit books for CLEO / ALPHA loan company; other steno books for ALPHA/CLEO; CLEO Company cash receipts 1990; and loose papers concerning CLEO/ALPHA loan companies.
The defendants also challenge the seizure of the files of James Economou and Jay Rosenfield on the theory that the files contained privileged material that was seized but not sealed until the time of inventory. These documents will not be suppressed because they name target clients and because there is simply no basis on which suppression is warranted.
IV. DISCUSSION AND RULINGS OF LAW REGARDING THE ROLE OF THE PROSECUTOR
This argument has previously received extensive consideration by this Court, and was rejected in the Court’s July 31, 1998 Memorandum of Decision on James N. Ellis Jr.’s Motion to Dismiss, Disqualify or For Other Appropriate Relief. In that decision, this Court found that the Insurance Fraud Division of the Office of the Attorney General is a disinterested prosecutor and that the Division’s prosecution of this case does not violate constitutional principles. That decision was affirmed by the Supreme Judicial Court in its decision of May of 1999. *449 Commonwealth v. Ellis, 429 Mass. 362 (1999). Accordingly, the defendants’ motion to suppress will not be allowed on these grounds.
CONCLUSION
After consideration of the facts of this case, taken in the totality of the circumstances, and a review of the applicable law, this Court concludes that, with the exception of the Marie Varney Mandeville file, the Dawn Piche file and the Vivian Delisa file, the warrants in this case were supported by probable cause and were sufficiently particular; and, that the provisions of the warrants included adequate protection for privileged documents.
Furthermore, with the exception of the items found by the Court to be outside the scope of the warrant and not within the plain view doctrine, it is the opinion of this Court that the search of the Ellis & Ellis law offices on May 2, 1996 was reasonable based on all the circumstances presented. Accordingly, as catalogued in the Order which follows, the motion to suppress will be ALLOWED in part and DENIED in part.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion to suppress is ALLOWED as to the following documents:
A. Those items for which the affidavit did not establish probable cause:
1. employment records of Marie Varney Mandeville and Dawn Piche;
2. the client file of Vivian Delisa Melton; and
3. loan records, with the exception noted in footnote 18.
B. Those items seized that were beyond the scope of the warrant:
1. binder labeled “Personnel”;
2. manilafolders labeled “Discrimination Info,” “The Prudential,” “Standard,” “401K,” and “Dept. Of Employ. Training”;
3. accordion file labeled “Old Claims June 93 — Dec. 93";
4. blank columnar pad;
5. “Employees Duties”;
6. “Notes of Albert Billings”;
7. “Check Requests”;
8. “Invoice from ALB”;
9. case status lists;
10. profit and loss statements of Ellis & Ellis;
11. “Kelly Lederer Files”;
12. “Names, DOI, Dates, JD#s”;
13. “Alphabetical List”;
14. “Doctors”;
15. blue and grey steno pad;
16. “PIP Info”;
17. Ellis & Ellis Trustee Project;
18. ledger sheets;
19. brown “Log Book”;
20. file folders “7/91,” “Mar. 3/91,” and “6/91";
21. cash reports for various months;
22. cash flow reports for various months;
23. “CLEO Company Trial Balance-December 31, 1990";
24. two blue Management Series books entitled “Record Book”;
25. reports, folders, and cash receipts journals concerning CLEO and ALPHA Loan Companies;
26. binders and audit books for CLEO/ALPHA loan company;
27. other steno books for ALPHA/CLEO;
28. CLEO Company cash receipts 1990; and
29. loose papers concerning CLEO/ALPHA loan companies.
In all other respects, the defendants’ motion to suppress evidence is DENIED

 In addition to filing motions to join the instant motion, several defendants have filed individual motions to suppress the evidence seized from the search of the law firm’s offices and storage facility. Those defendants have asked that the decision on their individual motions be considered together with this collective motion to suppress.

 Evidentiary hearings were held on October 26, 27, 28, and 29, 1998; and on November 6 and December 4, 1998. Eighteen persons testified. One hundred fifteen exhibits were admitted into evidence.

 Argument concerning the protection of privileged documents, probable cause for the issuance of the warrant, and the scope of the warrant was held on January 8, 11, 19, 22, and 29, 1999.

 The Insurance Fraud Bureau (“IFB”) is a private investigative agency, established by statute for the investigation and prevention of suspected fraudulent insurance transactions, including automobile insurance fraud and workers’ compensation fraud. After investigation, if it is believed that a case warrants criminal action, the IFB may refer the case for prosecution to the Insurance Fraud Division (“IFD”) of the Office of the Attorney General which is dedicated to the investigation and prosecution of insurance fraud. Prosecutor-ial decisions are then made by the Office of the Attorney General. For a more complete explanation of the relationship between the IFB and the IFD, see this Court’s Memorandum of Decision and Order on Defendants’ Motion to Dismiss, Disqualify or for Other Appropriate Relief, dated July 31, 1998 [8 Mass. L. Rptr. 678].

 Albert Fitzgerald, an IFB investigator, had conducted surveillance of the Ellis & Ellis law firm at the direction of Bruce Spencer. On March 4, 1996, Fitzgerald arrived at the *450 Norwich Street office at 6:00 a.m. At 7:16 a.m., a woman entered the building. On March 5, 1996, Fitzgerald observed the same woman entering the premises at 7:22 a.m. On March 6, 1996, Fitzgerald saw the same woman open the door at 7:15 a.m. This woman was later identified through Ellis & Ellis time records as Gail Maki, the receptionist.

 At the evidentiary hearing in October of 1998, Friend testified that, at the meeting of April 24, 1996, when he informed Judge Kottmyer that he wanted to enter early in the morning, she told him, “Well, you have a daytime warrant, that’s fine . . .’’ The statement was allowed into evidence to demonstrate Friends’ state of mind in executing the warrant. See Commonwealth v. Ford, 394 Mass. 421, 424 (1985); Commonwealth v. White, 32 Mass.App. 949, rev. denied, 413 Mass. 1102 (1992).

 Rapacki was chosen to supervise the privilege procedures because he was not involved in the investigation of Ellis & Ellis in any way. On the day of the search, Rapacki was designated the final arbiter of privilege.

 Friend had specific information from documents obtained from the Office of the Secretary of State that the Ellis & Ellis computer system and central server were equipped with modems, which made the server and computer accessible from outside the Ellis & Ellis offices. Furthermore, he was aware of programs available to Ellis & Ellis attorneys, accessible by way of a telephone modem, that could remove all or a selective part of a computer’s hard drive.

 Friend was also concerned about disclosure of information in the warrant because the off-site storage facility had not yet been located.

 Tracey Spencer admitted at the hearing on the motion to suppress that she was aware of an off-site facility but that she did not inform Friend of its location because she was concerned about the damage to the premises.

 The Commonwealth contends that James N. Ellis Jr. has disavowed knowledge of the CLEO /ALPHA loan company, and that he therefore cannot challenge the seizure of these records. That contention will be discussed below.

 It may be that Martha Porcaro could establish a reasonable expectation of privacy in her appointment books and logs if those documents were kept in her office in an area separate from the general files. That showing has not yet been made.

 The defendants attach significance to the fact that the social security number for one of the accidents was actually provided to the insurance company by Williamson’s employer, not Williamson himself. The reasonable inference that can be drawn, however, is that Williamson is the person who provided that incorrect social security number to his employer. As such, this explanation does not negate a probable cause finding.

 The defendants claim that Spencer misrepresented the fact that Formoso/Milan simultaneously received total disability benefits, because one of the insurance carriers denied the claim and did not pay the benefits; the fact that Formoso/Milan made the claim for the benefits is a crime, regardless of whether the claims were paid.

 Spencer had received third-hand information from Robert Finne, a former employee of Ellis & Ellis, that a doughnut shop was used to create fictional concurrent wage claims for Ellis & Ellis clients.

 The plain view doctrine is discussed more fully, infra.

 This does not mean, however, that loan records properly seized under other provisions of the warrant will be suppressed. For example, within the category of loan documents are the bank account records for the loan company as well as other related bank information which were properly seized pursuant to the provision of the warrant which allows for the seizure of all bank account information.

 The work product doctrine was espoused in Hickman v. Taylor, 329 U.S. 495 (1947), but has been extended to criminal proceedings. See United States v. Nobles, 422 U.S. 225, 236 (1975).

 Support for this is found in the master's statement that she reviewed the files submitted to her and found that “certain may involve work product only, or mixed work product and attorney-client privilege." Interim Report of Special Master, Appendix Volume III at 17.

 And it is important to note that the time cards reflected only the arrival times of hourly employees. Salaried employees, including all of the attorneys at the law firm, were not required to “punch in" when they arrived.

 Fitzgerald's March observations are reported at footnote 6, supra. On April 24, 1996, he observed an employee of Ellis & Ellis, later identified as Freida Vanikiotis arrive at the office at 6:48 a.m. On April 25, 1996, Fitzgerald observed Vanikiotis arrive at 6:45 a.m. On May 1, 1996, the day before the search warrant was executed, Fitzgerald observed another employee later identified as Natasha Fife, arrive for work at 6:30 a.m. followed by Vanikiotis at 7:10 a.m.

 There also was evidence that lawyers would frequently see clients at times other than between the hours of 9:00 a.m. and 5:00 p.m.

 This Court spent several hours reviewing the videotapes of the search filmed by the Commonwealth as well as the videotape submitted by the defendants. The videotapes simply do not evidence unnecessary destruction of property.

 Tracey Spencer and Anthony Ranauro testified that they each observed a trooper reading files; however, each made observation of a passing nature and neither was able to testify with any certainty that the files being read by the trooper contained any privileged information. As such, this testimony is not persuasive.